**GUARDIAN TRUST CO. et al. v. KANSAS CITY SOUTHERN RY. CO.**

Circuit Court of Appeals, Eighth Circuit.
May 18, 1928.

Rehearing Denied October 18, 1928.

No. 7784.

Justin D. Bowersock, of Kansas City, Mo. (Harry S. Mecartney, of Chicago, Ill., on the brief), for appellant.

S. W. Moore, of New York City, and A. F. Smith, of Kansas City, Mo. (F. H. Moore and Cyrus Crane, both of Kansas City, Mo., on the brief), for appellee.

Before WALTER H. SANBORN and BOOTH, Circuit Judges, and MUNGER, District Judge.

BOOTH, Circuit Judge. This is an appeal from a decree which granted to appellant (defendant below) relief as to principal matters involved, but failed to allow as costs a certain class of items to which appellant claimed to be entitled, but which the court held it had no authority to allow. The assignments of error all relate to the failure of the court to allow these costs as claimed by the appellant. For brevity, the Guardian Trust Company will be called Trust Company, and the Kansas City Southern Railway Company the Southern Company.

The litigation out of which these costs arose was commenced against appellant in September, 1900, and has continued to the present time. The history and details of the litigation may be gathered from the opinions reported in (C. C. A.) 146 F. 337; (C. C. A.) 171 F. 43; (C. C. A.) 201 F. 811; (C. C. A.) 210 F. 696; 240 U. S. 166, 36 S. Ct. 334, 60 L. Ed. 579. See, also, Guardian Trust Co. v. Shedd, 240 F. 689; Mecartney v. Guardian Trust Co. (C. C. A.) 280 F. 64. The character of the litigation will be presently stated.

This court, by its decree of December 2, 1913 (210 F. 696), reversed the decree of the trial court on the merits of the case, and directed that court to render a decree for the Trust Company in accord with the views expressed in the opinion of this court. In the opinion it was stated that application had been made to this court by certain stockholders of the Trust Company to direct the court below to find the amount of attorney's fees, expert accountant's fees, and stenographer's fees incurred by the Trust Company in the litigation, and to render a decree therefor in favor of the Trust Company. In reference to that application this court said:

"A deliberate consideration of this petition and of the exhaustive arguments of counsel have, however, persuaded that inasmuch

as the questions suggested came for the first time into this suit at the rehearing in this court, as no evidence has been taken relative to them, and as the evidence upon the issues tried in this case was not brought to this court, it would be unwise and might be unjust to adjudicate the questions presented by the petition of these stockholders. Moreover, as this court cannot rightly determine the questions relating to the costs to be taxed at this time, as there are established rules of practice concerning them, and as directions to the court below to open and try new issues might, and probably would, prolong this litigation through several years more, our conclusion is that our just course is to leave the taxation of costs to the court below under the principles, rules, and practice in equity." 210 F. 696, 723.

The decree of December 2, 1913, was affirmed by the Supreme Court (240 U. S. 166, 36 S. Ct. 334, 60 L. Ed. 579), and the mandate of that court carried the case back direct to the trial court.

Thereafter a motion was made in the trial court that a final decree be entered, and that costs and expenses of the litigation be allowed and adjudged in favor of the Trust Company. The Trust Company prayed that costs be taxed in its favor "as between solicitor and client." The appellee, Southern Company, insisted that the costs be limited to such as were taxable "between party and party." After considering the matter the court filed a memorandum, in which it was held:

"The right to tax costs as between solicitor and client depends upon one, or both, of two theories recognized in the law:

"First. Where gross charges of fraud and misconduct have been made and not sustained, and where the main ground of the suit is shown to be false, unjust, vexatious, wanton or oppressive. In other words, where charges amounting to scandal and a misuse of the courts are made and not sustained, but found to be baseless and unwarrantable.

"Second. Where a fiduciary relation exists between the parties, such as trustee and cestui que trust, or pledgor and pledgee, or principal and agent, and where the fiduciary is put to expense in the defense of an unfounded suit brought against him by such cestui que trust, or pledgor or principal, especially where charges of gross fraud and misconduct have been made against a fiduciary and have been found baseless and unwarrantable."

The court further held that costs "as between solicitor and client" might properly be taxed in the instant suit under the second

theory. Thereupon a special master was appointed "* * * to ascertain, take, and state an itemized account of all cost and expenses paid or incurred by the Guardian Trust Company or its various receivers for and on account of court costs and other expenses incurred by said Trust Company and its receivers in and about its resistance of and defense against this litigation, and in defending against the various original and dependent bills and petitions filed herein against the Guardian Trust Company or its receiver, by or at the instance of Kansas City Southern Railway Company, Cambria Steel Company, Kansas City Suburban Belt Railroad Company, or its receivers, or its subsidiary companies, or their receivers, parties to this cause, and in defending, maintaining, protecting, and preserving therein the right, equity, title, and lien of the Guardian Trust Company of its receivers as pledgee of the property described in paragraph V of the former decree of June, 1910, or in the property of any corporation whose stock was so held in such pledge, and the right to dispose of and realize upon said pledged property in accordance with the terms of the pledges under which said property was pledged, including, among other expenses, those for attorney's fees, counsel or solicitors' fees, stenographers' fees, expert accountants' fees, printing fees, traveling expenses, and other expenses incurred in the premises."

On September 15, 1924, the special master filed his report, wherein he set out at length the items of expense incurred by the Trust Company in the litigation, and specified those which he allowed and those which he disallowed. Fourteen exceptions to this report were filed by the Trust Company; 39 were filed by the Southern Company. On March 23, 1926, the trial court filed a memorandum, in which it was stated that upon fuller investigation the court was forced to revise its former views, and that it now held that no costs were allowable to the Trust Company "as between solicitor and client." Final decree was accordingly entered May 15, 1926, in which costs were allowed to the Trust Company only as "between party and party." The present appeal followed.

### The Character of the Litigation.

In any inquiry whether costs "as between solicitor and client" should be allowed a litigant in an equity suit, the character of the litigation is one of the main determining factors. It becomes necessary, therefore, in the instant suit to examine into the character of the litigation.

The bill filed by the Cambria Steel Company (hereafter called the Cambria Company) September 6, 1900, against the Kansas City Suburban Belt Railroad Company (hereafter called the Belt Company) and various other corporations, including the Guardian Trust Company, purported to be a creditor's bill against the Belt Company. In addition to the usual allegations, however, the bill alleged that the Trust Company had caused the incorporation of the constituent companies which afterward became the Belt Company, and absolutely dominated and controlled their affairs; that it had caused several other corporations to be formed for the purpose of building railroads, caused them to issue bonds to pay for the same, and completely dominated their affairs; that the Trust Company had caused the stocks and bonds of these various companies to be delivered to it, had sold the same, and had applied the excess of the proceeds over the cost of the railroads in the payment to itself of commissions and for services; that the Trust Company had assumed the position of trustee and agent in managing and disposing of these stocks and bonds, and had failed and refused to make an accounting therefor; that the Trust Company by reason of these transactions was owing the Belt Company a large amount of money.

The bill alleged further that the Trust Company had caused the legal title to properties necessary to be used by the railroad companies, including the Belt Company, to be placed in certain "dummy" companies with the fraudulent intent and purpose of preventing the properties being reached by the creditors of the railroad companies; that the Trust Company caused the Belt Company to enter into a pretended contract for the building of a certain link of railroad, which resulted in a loss of several hundred thousand dollars; that the contract for the construction in reality belonged to the Trust Company, and the resulting loss was its loss; that the Trust Company had charged up the loss to the Belt Company and was claiming the same as a liability in its favor against the Belt Company; that this action by the Trust Company was fraudulent in fact and in law; that the Trust Company had caused the Belt Company to transfer to it bonds, stocks, and other property as collateral for various pretended claims which it fraudulently asserted to exist in its favor against the Belt Company; that the Trust Company fraudulently caused pretended notes to be given to it by the Belt Company as represent-ing debts owing to it by the Belt Company; that the Trust Company had fraudulently appropriated to itself a large amount of the property of the Belt Company, consisting of stocks, bonds, and other securities; that the domination of the Trust Company over the Belt Company ceased in April, 1900.

The relief asked included that the Trust Company be adjudged to hold the said stocks of various companies and certain bonds in trust for the creditors of the Belt Company; that receivers be appointed for the Belt Company, with power to institute proceedings to recover the assets of that company; that an injunction issue, restraining the Trust Company from disposing of the property held by it as alleged collateral to indebtedness of the Belt Company. Receivers were appointed for the Belt Company, and a restraining order was issued against the Trust Company.

On November 20, 1901, the receivers of the Belt Company filed an ancillary bill in the Cambria Company suit. The Trust Company was made one of the defendants. This ancillary bill alleged largely the same facts as the Cambria Company bill, to wit, the formation of corporations by the Trust Company and the domination of them, including the Belt Company; the retention by the Trust Company of proceeds of sale of the stocks and bonds of said companies under the fraudulent pretenses that it was retaining them for the payment of commissions and services; the causing by the Trust Company of the signing by the Belt Company of pretended promissory notes, payable to the Trust Company, and causing stocks and bonds to be delivered to it as collateral to the notes. It was further alleged that the execution of the promissory notes and the delivery of the collateral were fraudulent and void.

The prayer of this ancillary bill asked for an accounting by the Trust Company as a trustee and agent for the Belt Company, that the notes be canceled as fraudulent, and that the Trust Company be restrained from transferring the collateral securities.

March 22, 1905, an amended and supplemental ancillary bill was filed by the receivers of the Belt Company. This bill reiterated to a large extent the charges made in the two preceding bills. It also charged conversion by the Trust Company of property of the Belt Company; also that the Trust Company occupied a fiduciary relation to the Belt Company, and by reason thereof had no right to charge any sums as profits; that the Trust Company in pursuance of a fraudulent plan sold worthless securities to the Belt Company; that the Trust Company fraudu-

lently made overcharges on its books against a subsidiary company of the Belt Company, which charges afterward became charges against the Belt Company; that the Trust Company made sales of stocks and bonds for the Belt Company and reported the same as made at less than the actual figures, thereby securing for itself a profit; that the Trust Company caused the Belt Company to declare and pay dividends when it was insolvent, and that the Trust Company as a stockholder in the Belt Company received such dividends; that the Trust Company caused the Union Terminal Company, whose stock was owned by the Belt Company, to issue bonds and deliver the same to the Belt Company contrary to the provisions of the mortgage in which the Trust Company was trustee, and further caused the Belt Company to deliver said bonds to the Trust Company, which company thereupon sold them and kept the proceeds, crediting the amount to the account of the Belt Company, all in violation of the duties of said Trust Company as trustee under said mortgage; that the Trust Company sold bonds belonging to the Belt Company, and fraudulently refused to account for the proceeds; that the Trust Company fraudulently appropriated several hundred shares of stock belonging to the Belt Company.

The prayer for relief in this amended ancillary bill was that the Trust Company account as trustee and as agent for the Belt Company; that the promissory notes of the Belt Company held by the Trust Company be found to have been fraudulently executed and for fraudulent purposes.

On the 2d of July, 1906, the surviving receiver of the Belt Company filed a second amended and supplemental ancillary bill. This bill also contained charges against the Trust Company of dominating over the Belt Company and its subsidiary and allied corporations; of causing fraudulent execution of the promissory notes of the Belt Company held by the Trust Company; of fraudulent delivery of the collateral by the Belt Company to the Trust Company; of fraudulent appropriation of bonds in connection with the construction of the railroad of a company known as the Suburban Company; of appropriation and conversion to its own use by the Trust Company of stocks and bonds of the companies subsidiary to the Belt Company. The bill also alleged that the Trust Company occupied a fiduciary relation to said companies, and that any contracts providing for trustee fees for the Trust Company were unlawful; that the Trust Com-

pany sold stocks and bonds of the Belt Company and reported to the Belt Company amounts of sales at less figure than the actual sales, and retained the balance. The bill also reiterated the charges against the Trust Company of violation of its duties as trustee under the Union Terminal Company mortgage.

The prayer of this bill also was for an accounting by the Trust Company, that the promissory notes executed by the Belt Company and held by the Trust Company be declared fraudulent and be canceled, and that the Trust Company be restrained from disposing of the stocks and bonds held by it as alleged collateral to the promissory notes of the Belt Company.

Meanwhile, on February 27, 1905, the Southern Company filed an intervening petition in the Cambria Company suit, and on May 1, 1905, it filed an amended intervening petition. Among other things the amended petition alleged: The foreclosure suits of the several mortgages, heretofore mentioned, on property of the Belt Company or its subsidiary companies, and sale of the properties to the Southern Company December 31, 1901; the foreclosure of the mortgage on the Kansas City, Pittsburg & Gulf Railroad Company, and sale of the property to a committee acting for the Southern Company; that the Trust Company was either sole trustee or cotrustee under each of said mortgages; that the Trust Company had caused each of said companies to be formed, and thereafter dominated their affairs; that the Trust Company claimed to hold, as collateral to an alleged indebtedness of the Belt Company to it, a large amount of stocks and bonds of a number of companies which were subsidiary to the Belt Company; that these securities had been owned by the Belt Company; that they had become included in the mortgage of the Belt Company by reason of an after-acquired property clause; that at the foreclosure sale under that mortgage these securities had been acquired by the Southern Company; that the Trust Company as trustee under the mortgage made by the Belt Company did not in any degree or in any way carry out the duties imposed upon it as trustee in said mortgage, but exercised its powers and duties as trustee in said mortgage in its own interest and in violation of its trust; that the Trust Company had also violated its duties as trustee in the several mortgages of the subsidiary companies of the Belt Company and the Gulf Company by appropriating to itself as collateral to an alleged indebtedness of the Belt Company to it, large amounts of stock and

bonds of said companies. The petition further alleged that the Trust Company, as co-trustee under the mortgage of the Union Terminal Railroad Company (one of the companies allied with the Belt Company), wrongfully and fraudulently and contrary to the terms of the mortgage, caused a large amount of the bonds to be sold and the proceeds to be applied on the alleged indebtedness of the Belt Company to the Trust Company.

The prayer of this petition was that the Trust Company be required to account for and pay over to the Southern Company the value of the stocks and bonds which it had wrongfully appropriated as set forth in the petition.

To these various bills and petitions the Trust Company answered. It denied among other things, that it had caused the Belt Company and its allied or subsidiary companies to be incorporated, or had dominated any of them; denied that it occupied any fiduciary relationship to the Belt Company or its allied or subsidiary companies, except that it had acted as trustee under mortgages executed by them; denied any wrongful or fraudulent action on its part, either as trustee or otherwise; alleged that the transactions between it and the Belt Company were shown upon the books of both companies, and that the books of the Trust Company had been repeatedly examined by the expert accountants of the Belt Company; admitted that it held collateral given to it by the Belt Company as security for the debts owed to it by that company; alleged that the collateral was given in good faith and to secure just debts evidenced by promissory notes and an open account, amounting to upwards of $300,-000; denied that the securities held by it as collateral had become included in the Belt Company mortgage by virtue of the after-acquired property clause, or had been sold to the purchaser at the foreclosure sale under said mortgage, or had been acquired by the Southern Company; alleged that at the request of the Belt Company, it had acted as financial agent for several of the subsidiary companies, and sold their stocks and bonds and received compensation therefor, all the facts relative to which were known and approved by the officers of the respective companies and of the Belt Company; alleged that all financial transactions of the Trust Company with or for the Belt Company or its allied or subsidiary companies were fully and fairly accounted for and approved by the officers of those companies.

In its answer to the amended and supplemental ancillary bill of the receivers of the Belt Company, the Trust Company prayed for judgment against the Belt Company and its receivers on the indebtedness owing by the Belt Company, and prayed further that the court protect and enforce the interest of the Trust Company in and to the stocks, bonds, and other property held by it as collateral. In its answer to the amended intervening petition of the Southern Company, the Trust Company also alleged that the Southern Company, by virtue of its acquirement of the properties of the Belt Company under the reorganization plan set out, had become liable for the debts of the Belt Company, including the debt owing to the Trust Company.

From the foregoing analysis of the pleadings it will be seen that among the issues raised were:

Whether the Trust Company had been guilty of fraud in its dealings with the Belt Company and with its allied and subsidiary companies.

Whether the Trust Company had occupied a fiduciary relation with said companies or any of them, except in so far as it had acted as trustee in several of the mortgages made by those companies; and, if so, whether it had violated that relationship.

Whether the Trust Company, while acting as trustee in said mortgages or any of them, had violated its trust.

Whether the Belt Company was indebted to the Trust Company.

Whether the Trust Company was entitled to hold the collateral which it claimed had been pledged to it by the Belt Company in connection with the debt.

Whether the said collateral came under the mortgage of the Belt Company and had been acquired by the Southern Company through the foreclosure sale under that mortgage.

Whether the Southern Company was liable to the Trust Company for the indebtedness of the Belt Company.

These issues were first passed upon by the special master. He found as follows:

"No stockholder has at any time objected to any of the transactions complained of in the bill."

"The transactions in dispute were open, not secret or concealed, and were either known to the stockholders, or could have been, if they had been at all diligent in trying to understand such transactions, which are spread with much explanatory detail, not only on the books of the Trust Company, but also on the books of the railway companies, and the very nature of the transactions, their magnitude and the long period of

time over which they extended, tend thoroughly to negative the idea of ignorance on the part of any stockholders."

"The transactions now attacked in the bill were expressly ratified by the stockholders, as shown by the minutes of the corporate meetings."

"The transactions in question are executed contracts, closed and consummated years before the original bill was filed, and, as the accounts between the Trust Company and these other companies were settled, from time to time, the Belt Company gave its notes for the balances due, and which notes were also paid off, from time to time."

"It is shown by the record that the bookkeeping was full, complete, and accurate as to all original entries and otherwise, and that the accounts between the companies were regularly stated and audited each month by formal certificates exchanged by their respective auditors, and that the books tallied to a cent."

"The Belt, in the transactions which are now attacked, received therefrom certain benefits and advantages, which the complainants have never offered to return, and, in the nature of things, cannot return. The status quo cannot be restored, which fact, if true, becomes a most important one in the final determination of the issues involved in the bill, and, especially so in the absence of fraudulent intent, or actual fraud, on the part of Trust Company, which is not shown by the proofs in the record."

"The Trust Company did not dominate and control the Belt Company, or any of the other companies involved in this controversy, as claimed by complainants in their bill."

" * * * The Trust Company was under no such duty to the Belt bondholders as would prohibit it from taking collateral security to secure an indebtedness to it from the Belt Company, nor was there any express covenant in the mortgage creating such duty, nor was there any such duty by implication of law."

The master held further that the Trust Company was entitled to hold all of the collateral mentioned in the Southern Company's petition in intervention, that the collateral did not become included under the Belt Company mortgage, and that the Southern Company had not acquired any right, title, or interest therein by virtue of the foreclosure sale under that mortgage.

The master recommended that the Cambria Company bill be dismissed for want of equity and that the injunction restraining the Trust Company from disposing of its collateral be dissolved. The master recommended, further, that the second amended and supplemental ancillary bill of the receiver of the Belt Company be dismissed as without equity, except as regards three small items of account, two of which had been admitted in the answer of the Trust Company. The master recommended, further, that the amended petition of intervention of the Southern Company be dismissed as being without either law or equity, except as to one paragraph in regard to certain lands standing in the name of the Central Improvement Company, one of the subsidiary companies, and that the Trust Company was entitled to hold and subject to the payment of the debt to it from the Belt Company all of the collateral mentioned. The master recommended, further, that the Southern Company be held not liable for the indebtedness of the Belt Company.

The trial court approved and confirmed the report of the special master, and entered a decree adjudging:

(a) That there was no equity in the bill of the Cambria Company, and that it be dismissed, and that the injunction issued in said cause against the Trust Company be dissolved.

(b) That the allegation in the ancillary bills of the receivers of the Belt Company as to the three items above mentioned were true, and that the Belt Company should have credit therefor; that as to all of the other allegations in said bills, the bills were without equity and were dismissed.

(c) That the allegations of the Trust Company touching the indebtedness of the Belt Company to it were true, and that there was due the Trust Company from the Belt Company $639,658.86, with interest.

(d) That the Trust Company was entitled to subject all the securities pledged to it (setting them out as claimed by the Trust Company) to the debt owed by the Belt Company.

(e) That the Southern Company was entitled to a conveyance from the Central Improvement Company of the lands standing in the name of that company.

(f) That the Southern Company was not liable for the debt of the Belt Company to the Trust Company.

Upon appeal, this court held with the trial court as to provisions of the decree set out in (a), (b), (c), and (d), supra, overruled the trial court as to provisions (e) and (f), supra, held further that the Trust Company, as pledgee of the stock of the Central

Improvement Company, had a right in the lands of the Central Improvement Company superior to the right of the Southern Company, and held further that the Southern Company was liable for the debt of the Belt Company to the Trust Company, and that the Trust Company was entitled to judgment against the Southern Company for $639,658.-86 and interest—the amount of the debt of the Belt Company to the Trust Company.

From the foregoing synopsis of the pleadings, findings, and decree in the litigation, it is clear that the charge that the Trust Company had committed fraud against the Belt Company was adjudged not true; the charge that the Trust Company had violated fiduciary relations with the Belt Company and its subsidiary companies was adjudged not true; the charge that the Trust Company had violated its duty as trustee under mortgages of the Belt Company and its subsidiary companies was adjudged not true. On the other hand, the claim of the Trust Company that the Belt Company was indebted to it in a large amount was adjudged true; the claim of the Trust Company that it held securities pledged by the Belt Company as collateral to the debt, and that it had a right to subject said securities to the payment of the debt, was adjudged true; the claim of the Trust Company that the Southern Company by its acquirement of the assets of the Belt Company had become possessed of property which in equity constituted a fund for the payment of the creditors of the Belt Company, including the debt of the Trust Company—was adjudged true.

It may not be amiss at this point to note, also, that this court, after the fullest consideration, reached the conclusion that all of the foregoing bills, ancillary bills, and petitions against the Trust Company were in reality sponsored by the Southern Company. This court characterized the Cambria Company suit as "baseless" and "unwarranted." In reference to the existence of a trust fund for the payment of creditors of the Belt Company, which fund had been disclosed in the litigation, this court said (210 F. 703, 708):

"Moreover, the property of the Belt Company was a trust fund. The stockholders of that company were trustees charged with the duty to apply that property to the payment of the claims of the Trust Company and of the other creditors of the Belt Company before they took to themselves any share in or benefit therefrom. When the Southern Company took their stock and gave them $4,750,000 par value of its stocks and bonds for their interest in the property of the Belt

Company, it stepped into their shoes and became a trustee for the creditors of the Belt Company with plenary notice that the interest of those creditors in the property was at least as much as the value of the stocks and bonds it was giving for the interest of the stockholders, for the rights of the creditors in the Belt property were prior and superior to those of the stockholders. * * *

"If the Southern Company had been the owner of the bonds of the Belt Company only, and knowing the condition and indebtedness of the Belt Company, as it did, had paid to the stockholders of that company $475,000 to the exclusion of the creditors for a conveyance of its property by the Belt Company to the Southern Company, it could not have escaped liability to the creditors of that company for that amount. Much less can it do so when it became owner of nearly all the Belt Company's stock, and in equity a trustee for its creditors. Story's Equity Jurisprudence, §§ 1261, 1262; Grenell v. Detroit Gas Co., 112 Mich. 70, 70 N. W. 413; Camden Interstate Ry. Co. v. Lee (Ky.) 84 S. W. 332, 333; Central of Georgia Ry. Co. v. Paul, 93 F. 883, 884, 35 C. C. A. 639; Luedecke v. Des Moines Cabinet Co., 140 Iowa, 223, 118 N. W. 457, 458, 32 L. R. A. (N. S.) 616; Hibernia Ins. Co. v. St. Louis & N. O. Trans. Co. (C. C.) 13 F. 516, 519. * * *

" * * * The Southern Company became liable to the Trust Company to the extent of its claim for the value of the $4,750,000 of its stocks, which it issued to the stockholders of the Belt Company to secure the property of the Belt Company and divert it from its creditors. Central of Georgia Ry. Co. v. Paul, 93 F. 883, 884, 35 C. C. A. 639; Camden Interstate Ry. Co. v. Lee (Ky.) 84 S. W. 332, 333. * * *

" * * * The transaction was a conveyance of the property of the Belt Company in fraud of creditors and a breach of trust by the Southern Company, which company, with full knowledge of all the facts, actively participated in the entire transaction and thereby acquired the property of the Belt Company, so that that property and the improvements the Southern Company has made thereon, free from the $1,000,000 Belt mortgage and free from any charge for the expenses which the Southern Company has made thereon, stands in its hands charged with a trust to pay the claim of the Trust Company against the Belt Company, which the court may execute by a seizure and sale by its master or receiver. Railroad Co. v. Soutter, 80 U. S. (13 Wall.) 517, 522, 524, 20 L. Ed. 543; Guckenheimer v. Angevine,

81 N. Y. 394, 397; Goble v. O'Connor, 43 Neb. 49, 61 N. W. 131, 132."

Such was the character of the main litigation and the outcome. We have not deemed it necessary for the purposes in hand to review such suits as the two unwarranted injunction suits brought by the Southern Company against the Trust Company, which were subordinate to the main litigation. They, however, furnish additional proof, if it were needed, of the vexatious character of the whole litigation. The history of those suits is to be found in (C. C. A.) 146 F. 337, and 171 F. 43.

We next turn to the consideration of the principles of law applicable to the foregoing facts and bearing upon the question: Whether the Trust Company is entitled to any costs "as between solicitor and client."

### Jurisdiction of Courts of Equity Relative to Costs.

I. It is well established that the jurisdiction to award costs "as between solicitor and client" has for several centuries existed in the English Court of Chancery, and has been exercised in a variety of cases. In Stallo v. Wagner (C. C. A.) 245 F. 636, 638, the court, in referring to the historical basis of the power of the equity courts in awarding costs, said:

"It was enacted by 17 Rich. II, c. 6, that the Chancellor should award damages according to his discretion against persons bringing vexatious and unfounded suits in chancery. And 'damages,' as used in this statute, has been understood as including costs. Since the enactment of the statute the power of adjudging costs has become apparently so far inherent in the equity court as to be inseparable from the exercise of its judicial authority. It has frequently been said that the power of a court of equity to give costs is wholly inherent in the court independent of any statutory authority, and solely according to the conscience of the court.

" 'This view,' it is said in Street's Federal Equity Practice, vol. 2, § 983, 'is too radical to be considered orthodox, but it seems correct to say that the power of the equity court to allow costs, though originating in statute, has become a common principle and incident of its judicial action, so that the mere establishment of a court of equity and the endowment of it with judicial authority necessarily imports a power in such court to adjudge costs. This idea is fully exemplified in the history of the subject of costs as dealt with in the federal courts.' "

Whether such jurisdiction had its origin in the Statute 17 Rich. II, c. 6, as some authorities hold, or existed before that time as inherent in the court, as others hold, is immaterial to our present inquiry, which is concerned only with the question of the existence of such jurisdiction at the time of the adoption of our United States Constitution. In the leading case of Andrews v. Barnes, L. R. 39 Ch. Div. 133, decided in 1888, the court said:

"The jurisdiction of the Lord Chancellor in costs was essentially different from that at common law. 'The giving of costs in equity,' said Lord Hardwicke in Jones v. Coxeter, 2 Atk. 400, 'is entirely discretionary, and is not at all conformable to the rule at law.' 'Courts of equity,' said the same great judge in another case, 'have in all cases done it' [i. e., dealt with costs] 'not from any authority' [i. e., as we understand, from any statutory or delegated authority], 'but from conscience and arbitrio boni viri, as to the satisfaction on one side or other on account of vexation.' Corporation of Burford v. Lenthall, 2 Atk. 551.

"An examination of the older General Orders of the Court, made, not under any statutory authority, but from the general and inherent authority of the Lord Chancellor, will show that the court exercised a most wide discretion, not only as to the circumstances under which costs were to be awarded, but apparently as to the measure and fullness of the costs. * * * The records of the Court of Chancery during the last century show that in numerous cases it has exercised the right of giving costs between attorney and client, or, to use the more recent language of the cases, between solicitor and client."

And after reviewing numerous authorities the court further said: "From this consideration of the earlier authorities we conclude that there was inherent in the Court of Chancery at the time of its abolition a general and discretionary power to award costs as between solicitor and client to a successful party, as and when the justice of the case might so require."

In Halsbury's Laws of England, vol. 26, p. 798, the statement is made: "The court has power by a special order to award costs as between solicitor and client to a successful party, where it is exercising its equitable jurisdiction, but not where it is exercising its ordinary common-law jurisdiction"—citing Andrews v. Barnes, supra; Mordue v. Palmer, L. R. 6 Ch. App. 22; Eady v. Elsdon, 70 L. J. K. B. 701; Brown v. Burdett, L. R. 40 Ch. Div. 244; Johnson v. Telford, 3 Russ.

477; In re Brown, L. R. 4 Eq. Cas. 464; Eland v. Medland, L. R. 41 Ch. Div. 476; Davies, Jenkins v. Davis (1891) 64 L. T. 824. See also cases cited in margin.[1]

The cases show, however, that costs "as between solicitor and client" have not been allowed by the English Chancery Court as a matter of course in equity cases. It is only in certain classes of cases, or when the peculiar facts warranted, that such costs have been allowed. A fair summary of the English cases in which such costs have been allowed, would, we think, include the following classes of cases:

A. Where gross charges of fraud and misconduct have been made and not sustained.

B. Where the main ground of the suit is false, unjust, vexatious, wanton, or oppressive, and so shown to be.

C. Where a fiduciary relation exists, such as trustee and cestui que trust, pledgor and pledgee, or principal and agent, and the fiduciary is put to expense, either in defending an unfounded suit or in administering or protecting and preserving the trust property or pledged property.

In all three classes of cases courts of equity have acted, as stated by Lord Hardwicke in Corp. of Burford v. Lenthall, 2 Atk. 551, from "conscience and arbitrio boni viri." As expressed by Lord Chancellor Loughborough in Dungey v. Angove, 2 Ves. Jr. 304, 313, the courts have taken this course "to do that which appertains to justice and that which appertains to example, and to vindicate the honor and justice of the court." Similar jurisdiction has been held to exist, and has been exercized, in the state courts of the United States, especially in those states where the courts of equity have remained distinct from those of law. See Danbury v. Robinson, 14 N. J. Eq. 324; Thome v. Allen (Ky.) 70 S. W. 410; Id. (Ky.) 71 S. W. 431.

II. The United States courts of equity at the time of their creation became endowed with the powers, including that over costs, possessed by the English Chancery Court. See authorities cited in the margin.[2] They have exercised such power, and the power has never been taken from them. And not only the equity jurisdiction of the federal courts has its basis in the jurisdiction of the English Chancery Court, but the practice of those courts, when not governed by statutes of the United States or by rules of the Supreme and lower courts, has a like basis. Rule 90 of the old Equity Rules, promulgated by the Supreme Court in 1842, pursuant to R. S. § 917 (28 USCA § 730), read as follows:

"In all cases, where the rules prescribed by this court, or by the Circuit Court do not apply, the practice of the Circuit Court shall be regulated by the present practice of the High Court of Chancery in England, so far as the same may reasonably be applied consistently with the local circumstances and local convenience of the district where the court is held, not as positive rules, but as furnishing just analogies to regulate the practice."

See 21 C. J. p. 31; Russell v. Farley, 105 U. S. 433, 437, 445, 26 L. Ed. 1060; Smith v. Burnham, Fed. Cas. No. 13,018.

In Payne v. Hook, 7 Wall. 425, 430, 19 L. Ed. 260, the court said: "The equity jurisdiction conferred on the federal courts is the same that the High Court of Chancery in England possesses."

In Fontain v. Ravenel, 17 How. 369, 384, 15 L. Ed. 80, the court said: "The courts of the United States cannot exercise any equity powers, except those conferred by acts of Congress, and those judicial powers which the High Court of Chancery in England, acting under its judicial capacity as a court of equity, possessed and exercised, at the time of the formation of the Constitution of the United States."

---

[1] In re Foster, L. R. 8 Q. B. Div. 515; Jones v. Coxeter, 2 Atk. 400; Corp. of Burford v. Lenthall, 2 Atk. 551; Simpson v. Malherbe, 4 Giff. 707; Ex parte Simpson, 15 Ves. Jr. 476; Dungey v. Angove, 2 Ves. Jr. 304, 313; Turner v. Collins, L. R. 12 Eq. Cas. 438, s. c. L. R. 7 Ch. Div. 329; Forester v. Read, L. R. 6 Ch. App. 40; Fane v. Fane, L. R. 13 Ch. Div. 228, 230; Courand v. Hanmer, 9 Beav. 3; Blest v. Brown, 4 De Gex F. & J. 367; Deggs v. Colebrook, 1 Atk. 396, West's Ch. R. 581; Masserene v. Lyndon, 2 Brown, 291; Rennett v. Green, 1 Cox, 253; Bruty v. Edmundson, 86 L. J. Ch. Div. 677; Edenborough v. The Archbishop of Canterbury, 2 Russ. 93; Daniel, Ch. Pl. & Pr. (6th Am. Ed.) 1434 et seq.

[2] 1 Pomeroy, Eq. Juris. (3d Ed.) § 294 et seq.; Eaton on Equity (2d Ed.) 17; 21 C. J. p. 27 et seq., § 6; Pennsylvania v. Bridge Co., 13 How. 518, 14 L. Ed. 249; Id., 18 How. 460, 15 L. Ed. 449; Fontain v. Ravenel, 17 How. 369, 15 L. Ed. 80; Payne v. Hook, 7 Wall. 425, 430, 19 L. Ed. 260; Russell v. Farley, 105 U. S. 433, 445, 26 L. Ed. 1060; McConihay v. Wright, 121 U. S. 201, 7 S. Ct. 940, 30 L. Ed. 932; Scott v. Neely, 140 U. S. 106, 110, 11 S. Ct. 712, 35 L. Ed. 358; Mississippi Mills v. Cohn, 150 U. S. 202, 205, 14 S. Ct. 75, 37 L. Ed. 1052; White v. Berry, 171 U. S. 366, 376, 18 S. Ct. 917, 43 L. Ed. 199; Waterman v. Canal, etc., Co., 215 U. S. 33, 43, 30 S. Ct. 10, 54 L. Ed. 80; Loring v. Marsh, 2 Cliff. 469, 493, Fed. Cas. No. 8,515; Parker v. Bigler, Fed. Cas. No. 10,726; Costs in Civil Cases, 30 Fed. Cas. No. 18,284; Michie's Encyc. of U. S. Reports, vol. 5, pp. 810, 811.

The distinction between the powers of federal courts of law and equity is often adverted to by the courts. In the early case of Parker v. Bigler, Fed. Cas. No. 10,726, Mr. Justice Grier, in disallowing certain items of costs in a law action, said:

"It is alleged that the Act of February 26, 1853, 'to regulate fees and costs,' proposes to define what shall be hereafter the fees or compensation to be allowed to attorneys, marshals, witnesses, jurors, commissioners, and printers, which shall be taxed and allowed, and not to define absolutely what expenses of trial may be recovered from the losing party as costs of suit. Hence it is contended that this charge is not excluded by the enumeration of persons whose fees are limited by this act, and the expense incurred for models being necessary for the information of the court and jury should be paid by the losing party, as part of the 'expensa litis.' This may be true in a court of chancery where the decree may include any expenses which have been necessarily incurred in the suit, for the information of the court and in order to a just decision of the cause. These may be imposed on either party or both as the conscience of the chancellor may dictate, yet, in courts of law no such discretion is given to the court."

In Pennsylvania v. Bridge Co., 13 How. 518, 563, 14 L. Ed. 249, the court said:

"Chancery jurisdiction is conferred on the courts of the United States, with the limitation 'that suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate, and complete remedy may be had at law.' The rules of the High Court of Chancery of England have been adopted by the courts of the United States. And there is no other limitation to the exercise of a chancery jurisdiction by these courts, except the value of the matter in controversy, the residence or character of the parties, or a claim which arises under a law of the United States, and which has been decided against in a state court.

"In exercising this jurisdiction, the courts of the Union are not limited by the chancery system adopted by any state, and they exercise their functions in a state where no court of chancery has been established. The usages of the high court of chancery in England, whenever the jurisdiction is exercised, govern the proceedings. This may be said to be the common law of chancery, and since the organization of the government, it has been observed."

This case came before the Supreme Court a second time, on the question of taxation of costs. 18 How. 460, 15 L. Ed. 449. The court discussed the power of the federal equity courts to award costs both as provided by the statutes of the United States and as inherent in the courts of equity. In the course of its opinion it said (page 462):

"Original jurisdiction in equity, in a particular class of cases, conferred by the Constitution on this court, has been interpreted to impose the duty to adjudicate according to such rules and principles as governed the action of the Court of Chancery in England, which administered equity at the time of the emigration of our ancestors, and down to the period when our Constitution was formed. And when the Constitution of the United States conferred that jurisdiction on this court, it cannot be construed to exclude the power possessed and constantly exercised by every court of equity then known, to use its discretion to award or refuse costs, as its judgment of the right of the case, in that particular, might require. The court entertains no doubt of its power to award costs, and deny the application to file a bill of review."

The costs awarded included expenses of taking testimony, expenses of surveys, examinations, and reports of an engineer. It is true that these expenses had been incurred by order of the court; but this fact emphasizes rather than throws doubt upon the power of the court over costs. This case has been recognized and approved in the late case of Newton v. Consolidated Gas Co., 265 U. S. 78, 83, 44 S. Ct. 481, 483 (68 L. Ed. 909), where the court used the following language:

"The allowance of costs in the federal courts rests not upon express statutory enactment by Congress, but upon usage long continued and confirmed by implication from provisions in many statutes. Ex parte Peterson, 253 U. S. 300, 316 [40 S. Ct. 543, 64 L. Ed. 919]; and see Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 460."

In Ex parte Peterson, 253 U. S. 300, 40 S. Ct. 543, 64 L. Ed. 919 (a law case), the court considered the question of the power of the court over costs both in actions at law and in equity causes, and by analogy allowed as costs in the particular case the expense of an auditor, though no such item was authorized by statute of the United States or of the state of New York, where the action was tried. In its opinion the court said (pages 316, 317 [40 S. Ct. 548]):

"The allowance of costs in the federal courts rests not upon express statutory enactment by Congress, but upon usage long continued and confirmed by implication from provisions in many statutes. Mr. Justice Woodbury in Hathaway v. Roach [Fed. Cas.

No. 6,213], 2 Woodb. and M. 63; Mr. Justice Nelson in Costs in Civil Cases [Fed. Cas. No. 18,284], 1 Blatchf. 652; The Baltimore, 8 Wall. 377 [19 L. Ed. 463]. In Hathaway v. Roach, p. 67, it is said to have been the usage of the federal courts 'to conform to the state laws as to costs, when no express provision has been made and is in force by any act of Congress in relation to any particular item, or when no general rule of court exists on this subject.' And in The Baltimore, pages 390, 391, this court stated that 'the costs taxed in the Circuit and District Courts were the same as were allowed at that time in the courts of the state, including such matters as travel and attendance of the parties, fees for copies of the case, and abstracts for the hearing, compensation for the services of referees, auditors, masters and assessors, and many other matters not embraced in the fee bills, since passed by Congress.'

"Neither the Act of February 26, 1853, c. 80, 10 Stat. 161, Rev. Stats. § 983 [28 USCA § 830] nor any later act of Congress or rule of court, deals expressly or by implication with the subject of taxing as costs the expense of an auditor. The practice, if any, governing in this respect the courts of New York would, therefore, be followed in the federal courts. See Huntress v. Town of Epsom [C. C.] 15 Fed. Rep. 732. But, so far as appears, the preliminary hearing before an auditor in aid of jury trials is not a part of the judicial machinery of that state. The nearest analogy to it is the reference had in actions at law on long accounts as a substitute for a jury trial. The expense of the compulsory reference in such actions is so taxable. Code Civ. Proc. § 3256. As there is no statute, federal or state, and no rule of court excluding auditors' fees and the expense of his stenographer from the items taxable as costs, no reason appears why they may not be included, like other expenditures ordered by the court with a view to securing an intelligent consideration of a case."

See, also, State of Missouri v. State of Illinois, 202 U. S. 598, 26 S. Ct. 713, 50 L. Ed. 1160.

Many statutes and rules have been passed from time to time relative to costs in the federal equity courts. An exhaustive review of them would serve no useful purpose at this time. A number of the earliest statutes and rules are reviewed in Costs in Civil Cases, Fed. Cas. No. 18,284; The Baltimore, 8 Wall. 377, 19 L. Ed. 463; Jordan v. Agawam Woollen Co., Fed. Cas. No. 7,516. Later provisions are to be found

in the statute of 1853 (10 Stat. 161, c. 80, § 1); also in R. S. §§ 823, 824, 983, 984 (U. S. C. tit. 28, §§ 571, 572, 830, 831 (28 USCA §§ 571, 572, 830, 831); and in new Equity Rules 20, 50, 51, 58, 59, 67, 68, 76.

These statutes and rules, however, are not the exclusive source of power in the federal equity courts touching the matter of costs, including solicitor's fees. This is plainly apparent from the authorities. In Newton v. Consolidated Gas Co., supra, the power of the court to allow as costs an item not covered by either statutes or rules was made to depend upon local custom. And a long line of cases exists where allowances in the way of counsel fees have been made, although such allowances were not covered by rules or by statutes.

The Apollon, 9 Wheat. 362, 6 L. Ed. 111, was a libel brought by the master of the French ship Apollon against the collector of the district of St. Mary's for damages on account of an alleged illegal seizure of ship and cargo. Various items of damages were recovered, including one for $500 for necessary counsel fees. In reference to this item the Supreme Court, speaking by Mr. Justice Story, said (page 379): "The fifth item, allowing $500 as counsel fees, is, in our opinion, unexceptionable. It is the common course of the admiralty to allow expenses of this nature, either in the shape of damages or as part of the costs. The practice is very familiar on the prize side of the court; it is not less the law of the court in instance causes —it resting in sound discretion to allow or refuse the claim." To the same effect, see Canter v. Insurance Companies, 3 Pet. 307, 7 L. Ed. 688. See, also, The Elizabeth Frith, Fed. Cas. No. 4,361.

It is true that in The Baltimore, 8 Wall. 377, 19 L. Ed. 463, the opinion was expressed by Mr. Justice Clifford that, after the passage of the Act of February 26, 1853, counsel fees, except as provided in that act, were not allowable as costs in admiralty, and in the course of his opinion he referred to the Apollon and Canter Cases and said (page 393): "Reference is made to two cases where counsel fees were allowed, but it is a sufficient answer to those cases to say that they were decided before the act of Congress under consideration was passed." But the scope of this statement must be restricted to the particular class of cases under discussion, for the practice of allowing counsel fees as costs in proper cases was not abrogated by the Act of February 26, 1853.

In United States v. Waters, 133 U. S. 208, 212, 10 S. Ct. 249, 250 (33 L. Ed. 594), the

court, speaking of this practice, said: "Both before and since the enactment of the statute of 1853, courts in the exercise of their discretion have allowed counsel fees in many cases without question when reviewed by this court. In The Apollon, 9 Wheat. 362, 379 [6 L. Ed. 111], and in Canter v. American and Ocean Insurance Companies, 3 Pet. 307, 319 [7 L. Ed. 688], the allowance of counsel fees by the court below was affirmed by this court as a matter within the sound discretion of the court before whom the cause was tried, and those decisions were cited with approval in Elastic Fabrics Co. v. Smith, 100 U. S. 110 [25 L. Ed. 547], and Paper Bag Cases, 105 U. S. 766, 772 [26 L. Ed. 959]." See, also, Ex parte Jaffray, Fed. Cas. No. 7,170; Spaulding v. Tucker, Fed. Cas. No. 13,221; Cuyler v. Atlantic & N. C. R. Co. (C. C.) 132 F. 570.

The Act of February 26, 1853, covered party and party costs, but not solicitor and client costs. In Trustees v. Greenough, 105 U. S. 527, 535, 536, 26 L. Ed. 1157, the court said: "The feebill is intended to regulate only those fees and costs which are strictly chargeable as between party and party, and not to regulate the fees of counsel and other expenses and charges as between solicitor and client, nor the power of a court of equity, in cases of administration of funds under its control, to make such allowance to the parties out of the fund as justice and equity may require. * * * And the act contains nothing which can be fairly construed to deprive the Court of Chancery of its long-established control over the costs and charges of the litigation, to be exercised as equity and justice may require, including proper allowances, to those who have instituted proceedings for the benefit of a general fund." And see 15 C. J. p. 20, § 1; 5 Encyc. Pl. & Pr. pp. 224–225; In re Paschal, 10 Wall. 483, 493, 19 L. Ed. 992; Louisiana State Lottery Co. v. Clark (C. C.) 16 F. 20.

It is true that federal courts of equity have refused to allow attorney's fees to be taxed as costs in many cases. Among them the following may be cited: Arcambel v. Wiseman, 3 Dall. 306, 1 L. Ed. 613; The Baltimore, 8 Wall. 377, 19 L. Ed. 463; Oelrichs v. Spain, 15 Wall. 211, 21 L. Ed. 43; McIntosh v. Ward (C. C. A.) 159 F. 66; New York C. & H. R. Co. v. Bank of Holly Springs (C. C. A.) 195 F. 456; Leary v. United States (C. C. A.) 257 F. 246. But such refusals were based, not upon any lack of power in the court, but because it was not deemed wise policy to allow attorney's fees to be taxed as costs in ordinary equity cases.

There are also many cases in which federal courts of law have refused allowance of costs "as between solicitor and client," but we have not considered them as apposite to the present inquiry. We think it may be safely stated, however, that whenever there have come before federal courts of equity cases in which special facts showed that, in accordance with established principles of right and equity, costs "as between solicitor and client" ought to be allowed, the courts have not refused to make such allowances.

The most common classes of cases, though by no means exclusive, in which such cost allowances have been made in equity, are:

Foreclosures of mortgages, as illustrated by Dodge v. Tulleys, 144 U. S. 451, 12 S. Ct. 728, 36 L. Ed. 501; Meddaugh v. Wilson, 151 U. S. 333, 14 S. Ct. 356, 38 L. Ed. 183; Cowdrey v. Galveston, etc., R. Co., 93 U. S. 352, 23 L. Ed. 950; Williams v. Morgan, 111 U. S. 684, 4 S. Ct. 638, 28 L. Ed. 559; Phinizy v. Augusta & K. R. Co. (C. C.) 98 F. 776; Fidelity Trust Co. v. Hutchison Chemical & Alkali Co., 221 F. 63 (C. C. A. 8).

Receiverships, as illustrated by Stuart v. Boulware, 133 U. S. 78, 10 S. Ct. 242, 33 L. Ed. 568; Eames v. H. B. Claflin Co. (C. C. A.) 231 F. 693; Presidio Mining Co. v. Overton (C. C. A.) 286 F. 848; J. C. Turner Lumber Co. v. Toomer (C. C. A.) 275 F. 678; City of New Orleans v. Malone (C. C. A.) 12 F.(2d) 17.

Suits by stockholders to preserve the property rights of their corporation, as illustrated by Cuyler v. Atlantic & N. C. R. Co., supra; McCourt v. Singers-Bigger, 145 F. 103, 7 Ann. Cas. 287 (C. C. A. 8); Colley v. Wolcott, 187 F. 595 (C. C. A. 8); Thompson v. Bomar, 258 F. 339 (C. C. A. 8); Hutchinson Box, etc., Co. v. Van Horn, 299 F. 424 (C. C. A. 8); Hodgman v. Atlantic Refining Co. (D. C.) 8 F.(2d) 777.

Suits by one or more creditors to preserve and bring into court for administration a fund in which they are interested, as illustrated by Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157; Central R., etc., Co. v. Pettus, 113 U. S. 116, 5 S. Ct. 387, 28 L. Ed. 915; Harrison v. Perea, 168 U. S. 311, 18 S. Ct. 129, 42 L. Ed. 478; Central Trust Co. v. Ingersoll (C. C. A.) 87 F. 427; Burden Central, etc., Co. v. Ferries, etc., Co. (C. C. A.) 87 F. 810; Central Trust Co. v. U. S. Light & Heat Co. (C. C. A.) 233 F. 420; Muskegon Boiler Works v. Tenn. Valley I. & R. Co. (D. C.) 274 F. 836.

Certain classes of proceedings in connection with bankruptcy matters, as illustrated

by Ex parte Jaffray, supra; Randolph v. Scruggs, 190 U. S. 533, 23 S. Ct. 710, 47 L. Ed. 1165; Beach v. Macon Grocery Co. (C. C. A.) 125 F. 513; Receivers of Vir. Iron, Coal & Coke Co. v. Staake (C. C. A.) 133 F. 717; In re Lacov (C. C. A.) 142 F. 960; In re Schocket (D. C.) 177 F. 583; In re Stewart (C. C. A.) 179 F. 222; In re Wentworth Lunch Co. (C. C. A.) 191 F. 821; In re J. F. Pierson, Jr., & Co. (D. C.) 225 F. 889; Bramble v. Brett, 230 F. 385 (C. C. A. 8).

Closely akin to the foregoing classes of cases are those involving allowances made to a pledgee for expenses and attorney's fees in preserving and defending the pledged property. In 31 Cyc. p. 826, the author states the rule as follows:

"The pledgee has a lien on the property for any expenses, including the attorney's fees, reasonably incurred by him in keeping and caring for the property pledged, protecting it against liens, taxes, and assessments, or otherwise protecting the pledgor's rights, in making sale for the enforcement of the pledge, in collecting choses in action, and other expenses incurred in rendering the pledged property available for the payment of his debt, although not for any expenses incurred by reason of his own wrongful act." And see Jones on Collateral Securities (3d Ed.) § 400; Raley v. Ross, 59 Ga. 862; Planters' Rice-Mill Co. v. Merchants' Nat. Bank, 78 Ga. 574, 3 S. E. 327; Hurst v. Coley (C. C.) 22 F. 183; Gregory v. Pike (C. C. A.) 67 F. 837; Danbury v. Robinson, supra; Ballingall v. Hunsberger, 16 Pa. Super. Ct. 117; Ely-Walker Dry Goods Co. v. Colbert, 58 Tex. Civ. App. 561, 124 S. W. 705; Parker v. Watkins, Johnson's Reports (Eng.) 133, 137.

The case of Spring Garden Ins. Co. v. Amusement Syndicate Co., 178 F. 519 (C. C. A. 8), though not falling under any of the foregoing classes, is interesting and instructive. Actions had been commenced by the appellee in the state court of Kansas against several insurance companies on fire insurance policies. Several of the insurance companies removed their cases to the federal court, and thereupon two of the companies filed therein a bill in equity, making as parties defendant all of the other insurance companies and the insured, and setting up that an accounting and contribution was necessary if liability should be found to exist. The other insurance companies by answers and cross-bills made similar allegations. The insured by cross-bill set up the same facts that it had set up in the complaints in the state court. Recovery was had by the insured. A statute of Kansas provided that in suits on insurance policies a reasonable attorney's fee could be recovered as part of the costs. This court not only allowed as costs a reasonable attorney's fee, but went further and allowed the costs in the actions pending in the state court. The court said (page 534): "The insurance companies invoked the aid of a court of equity and in courts of equity the payment of costs by the respective parties is a proper matter of equitable distribution."

It is true that in most of the cases where costs "as between solicitor and client" have been allowed, there has been a fund in court out of which the allowance was ordered paid. But this fact has not conditioned the jurisdiction of the court to make such allowance. There is no statute or rule to that effect, nor has such been the practice. It does not appear that there was any fund in court in Pennsylvania v. Bridge Co., supra, nor in Spring Garden Ins. Co. v. Amusement Syndicate Co., supra, nor in Re Schocket, supra. In Beach v. Macon Grocery Co., supra, in Re Lacov, supra, and in Re Wentworth Lunch Co., supra, although there was a fund, yet costs and expenses of a receivership were ordered paid by the losing parties. And see Burnrite Coal Co. v. Riggs, 274 U. S. 208, 47 S. Ct. 578, 71 L. Ed. 1002.

Furthermore, in cases where a trustee has been brought into court by a cestui que trust upon charges of maladministration which have proved to be unfounded, costs "as between solicitor and client" have been allowed the trustee, though there has been no fund in court. Perry on Trusts (6th Ed.) § 894, states as follows:

"The general rule is, that trustees shall have their costs either out of the trust fund, or from the cestuis que trust personally. If there is a fund within the control of the court, they may have their costs as between solicitor and client. Where there is no fund within control of the court, if the cestuis que trust bring the trustees before it to obtain a direction as to the rights of the parties, or the mode of administration, and the trustees are free from all blame or fault, they are entitled to costs against the cestuis que trust personally, to be taxed as between solicitor and client. The reason involved in the rule is this: Trustees have no beneficial interest in the trust property. They hold it for the accommodation and benefit of others. If they perform their duties faithfully, and are guilty of no unjust, improper, or oppressive conduct, they ought not in justice and good conscience to be put to any ex-

pense out of their own moneys. If, therefore, they are brought before the court without blame on their part, they should be reimbursed all the expenses that they incur, and allowed their costs as between solicitor and client for this purpose."

### The Case at Bar.

■ From the foregoing authorities, and many others which might be cited, we think it is clearly established that the federal courts of equity have jurisdiction to allow in proper cases costs "as between solicitor and client," and that such allowances have been made in many cases of various classes whenever the special facts warranted.

■ We are also of the opinion that the facts in the case at bar make it one calling for the application of the rules and principles that govern courts of equity in awarding such allowances. We have here a case where the Trust Company, a pledgee of securities as collateral to the debt of the Belt Company, was brought into court by a third party and compelled to litigate not only the validity and amount of its debt, but the title of the pledgor to the pledged property. At great expense the Trust Company established the validity and amount of its claim, and also established the title of the Belt Company to the pledged property at the time of the pledge, and its own right to subject the pledged property to the payment of the Belt Company's debt. The pledged property is in the constructive possession of the court.

Again, we have here a case in which the Trust Company, which had been a trustee under the mortgage of the Union Terminal Railroad Company, one of the subsidiary companies of the Belt Company, was brought into court by the Southern Company, successor in interest of the cestui que trust, and charged with gross and fraudulent violation of its duties as such trustee, and damages were sought against it in the sum of $773,-000. Other charges of violation of duty as trustee were made by the Southern Company against the Trust Company. At great expense the Trust Company met and answered these charges. They were found without merit and baseless.

Again, we have here a case in which the Trust Company, a creditor of the Belt Company, in the course of the litigation uncovered and brought into the constructive possession of the court a fund from which creditors of the Belt Company were entitled to be paid. That fund was represented by the amount which the Southern Company had paid to the stockholders of the Belt Company for their stock pursuant to the reorganization plan. It is true that in the suit in which this fund was uncovered the Trust Company was not a party plaintiff in its own behalf and in behalf of other creditors of the Belt Company. But we think, under the peculiar circumstances of the case, this can make no difference. The Cambria Company, a creditor of the Belt Company, had brought a suit, in form a creditor's bill, against the Belt Company, and had made the Trust Company, which was also a creditor of the Belt Company, a party to the suit. If the Cambria Company had uncovered the fund which this court afterward held was a trust fund for the payment of the creditors of the Belt Company, it cannot be doubted that the Cambria Company would have been entitled for so doing to an allowance, in the way of costs "as between solicitor and client." But early in the litigation the Cambria Company voluntarily ceased to be a factor, so far as concerned any efforts to establish a fund for the payment of the Belt Company creditors. It remained for the Trust Company, by its own unaided efforts and in the face of the most strenuous opposition, to establish that trust fund. Other creditors by appropriate action on their part might have participated in that fund; and if astute action has been exercised in paying off other creditors, and in thus isolating the Trust Company, such action cannot avail to destroy the equitable right of that company to some compensation for its services in this matter.

In view of the state of the record, the case must be sent back to the trial court to make the proper allowances for costs "as between solicitor and client." The special master's report has been made. Numerous exceptions have been filed thereto by both parties. Doubtless these will have to be passed upon. We see no necessity for the taking of further testimony. The amounts to be allowed are not controlled by what the Trust Company actually expended, and may vary widely therefrom. The allowances should be such as, in view of the facts and circumstances proved in this case which authorize them, will be reasonable and just.

The decree is reversed, with instructions for further proceedings in accordance with the views herein expressed.

. The foregoing opinion was concurred in by Judge SANBORN, but not filed until after his death.