## WILLIAMS & Another *v.* MORGAN & Another, Trustees.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF LOUISIANA.

Argued October 30th, 31st, 1883.—Decided May 5th, 1884.

*Appeal—Jurisdiction—Parties.*

A decree in a suit in a circuit court for the foreclosure of a railroad, fixing the compensation to be paid to the trustees under the mortgage from the fund realized from the sale, is a final decree as to that matter, and this court has jurisdiction on appeal.

A holder of railroad bonds secured by a mortgage under foreclosure, has an interest in the amount of the trustee's compensation which entitles him to intervene, and to contest it, and to appeal from an adverse decision.

When purchasers at a sale of a railroad under foreclosure purchase under an agreement, recognized by the court and referred to in the decree, that a new mortgage shall be issued after the sale, a part of which is to be applied to the payment of the foreclosure debt and a part to the payment of expenses, which expenses include the compensation of the trustees under the mortgage foreclosed, the purchasing committee named in that agreement have an interest in fixing that compensation which entitles them to intervene, and to be heard, and to appeal from an adverse decision.

On the facts in this case the allowances made below are held to be excessive.

The facts are stated in the opinion of the court.

*Mr. J. Hubley Ashton* (*Mr. James Thomson* was with him) for appellants.

*Mr. John A. Campbell, Mr. John E. Parsons, and Mr. George De Forest Lord* for appellees.

MR. JUSTICE BRADLEY delivered the opinion of the court.

In this case, the only question on the merits relates to the compensation which ought to be allowed to the trustees and receivers of a certain railroad mortgage for their services. A preliminary question, however, is raised, as to the right of the appellants to bring the case here by appeal.

The New Orleans, Mobile, and Chattanooga Railroad Company, on the 1st of January, 1869, executed a first mortgage on its railroad and franchises to secure the payment of four thousand coupon bonds of $1,000 each, with interest at eight per cent. per annum. Oakes Ames and Edwin D. Morgan were the trustees. The former having died, James A. Raynor was appointed in his stead. A second mortgage was given in March, 1869, but was foreclosed in 1870, and the property was bought in for the second mortgage bondholders, who reorganized under the name of the New Orleans, Mobile, and Texas Railroad Company, and gave another mortgage (generally called the second mortgage) to secure $2,000,000, subject to the incumbrance of the first mortgage. Default being made in payment of interest, the trustees, E. D. Morgan and James A. Raynor, in January, 1875, by virtue of a provision in the first mortgage, took possession of the property, but soon found it necessary to secure the sanction and protection of judicial proceedings. On the 12th of March, 1875, they filed a bill for foreclosure and sale of the mortgaged property in the Circuit Court of the United States for the District of Louisiana, and were appointed receivers in addition to their character as trustees. The railroad covered by the mortgage was the road running along the Gulf between Mobile and New Orleans, and was in a dilapidated condition, needing new bridges, new embankments, and extensive repairs as well as rolling stock and machinery. The road and property were managed and taken care of by the trustees and receivers for over five years, during which time Raynor had special charge of the road, superintending and managing everything in that department; whilst Morgan looked after the finances of the concern in New York. They brought the road up to an efficient condition, and made it a desirable property. There is no doubt, from the evidence, that their services were of the greatest value. Raynor gave his

whole time to the road itself and its practical working, superintended the erection of bridges, the raising of the embankment on the marshes, the procurement of depot and ferry accommodations in New Orleans and Mobile, and whatever related to the actual management and superintendence of the road as an important business thoroughfare of travel and transportation. In November, 1875, the trustees applied to the court to allow a fixed compensation to Raynor for the extra service he was performing. In their petition, they say:

" Your petitioners further represent that James A. Raynor has had to perform the duties of general manager of the railroad in place of the officer of the company, and that in the course of the year he has been put to more than the usual labor and care in the management of the administration of the road itself, performing the functions of manager and president, and directors, besides the functions of trustees. Your petitioners respectfully submit an application for a salary or allowance to him during their administration, either by the year or otherwise. No application for trustees, allowances will be made, or is designed herein, but only in respect to the salary of this officer, and for a provision for necessary expenses in order that the disbursements for operating expenses and administration shall all appear."

This application was referred to the master, who reported that, in his opinion, " an allowance of $10,000 per annum, with necessary expenses, not to exceed $2,500 per annum, should be made to Mr. Raynor ; " and this report was confirmed by the court subject to any exceptions that might be filed within thirty days. No exceptions were filed, and Raynor received this allowance during the period of his administration, and no question has ever been made of its propriety.

In the latter part of 1879 it was deemed advisable that the trust should be brought to a close and the property sold. About that time negotiations were set on foot for a purchase of the road in the interest of the Louisville and Nashville Railroad Company, which was then extending its business ramifications throughout a large portion of the Southern States. In December, 1879, a large number (more than a majority) of the

first mortgage bondholders executed an agreement by which they appointed George Bliss, L. A. Van Hoffman, and Oliver Ames a committee to negotiate and sell either the bonds or the railroad, and if the latter, to get a decree for foreclosure and sale in the pending proceedings, with power to purchase in the property for the common interest; and they all agreed to deposit their bonds with the Central Trust Company of New York, subject to the disposal of the committee, either for sale or to be used in paying the purchase-money of the road. And the committee was specially authorized, in concert with the trustees and receivers, to make an arrangement with the Louisville and Nashville Railroad Company to transfer the purchase of the road (when made by the committee) to a corporation to be organized in the interest of that company, for its bonds to the amount of $5,000,000, secured by vendor's lien and first mortgage on the railroad purchased; it being, amongst other things, stipulated as follows:

" The trustees and receivers to be protected against all their obligations from management, bonds, contracts complete or incomplete, or otherwise, and all the liabilities of the trustees and receivers, including all the expenses and charges of the foreclosure, reorganization, and everything incident thereto, to be paid in *cash*, to be furnished for the purpose, to the purchasing committee. Four million dollars of such bonds to be disposed of by the purchasing committee in exchanging bond for bond or bonds (and coupons as aforesaid), secured by the said first-mentioned mortgage, the residue of such four millions, and the other one million of such bonds the Louisville and Nashville Railroad Company to have the right to use in providing the cash for the payment hereinbefore mentioned, and in paying the amount necessary to be paid to bondholders, secured by the said first-mentioned mortgage, who shall not become parties to this agreement, the surplus, if any, to belong to the Louisville and Nashville Railroad Company."

On the 10th of February, 1880, another agreement was entered into, called the purchasing agreement, between the bondholders of the first part, the same purchasing committee of the

second part, and David Thomson and William S. Williams, of the third part, by which the authority given to the purchasing committee, by the previous instrument, was confirmed, including that of taking the bonds of the Louisville and Nashville Railroad in exchange for the first mortgage bonds of the N. O., Mobile, and Texas Railroad Company; and Thomson and Williams, proposing to act as purchasers, engaged to obtain from the Louisville Company an agreement to give its coupon bonds for $5,000,000 to carry out the arrangement substantially as indicated in the former agreement. If such an agreement should be obtained, then the railroad, franchises, equipment, and property should be sold under a decree of foreclosure and sale in the pending cause, according to law, and bid in by the committee for the purpose of carrying out the arrangement. It was also agreed that the receivers and trustees should, by the Louisville Company, or in some other satisfactory manner, be protected from all their obligations and liabilities; and it was further agreed, as follows :

"That all liens that may be declared to be superior to the first mortgage bonds, and that the certificates and liabilities and lawful fees, charges, and expenses of the receivers and trustees, and the disbursements of the committee, all to be decreed by the court, unless fixed by agreement, including all the expenses and charges of the foreclosure and of the proceedings to carry out this agreement, less amounts which may be available in the receiver's hands for payment upon such certificates, shall be paid in *cash* at the time to be appointed by the court for taking title under the foreclosure sale, and that all amounts necessary to be paid to bondholders who shall not become parties hereto shall also be paid in cash at the same time, and the purchasers [that is, Thomson and Williams] hereby agree to provide the necessary amounts, and for the purpose they will be entitled to such of the said five million dollars of bonds as shall not be exchanged for bonds deposited as above provided. Said bonds to become their absolute property, charged only with the payments herein last above provided for."

It was further agreed that the purchasing committee, in

making bids, should act under the direction of the purchasers (that is, Thomson and Williams), provided that the price should be sufficient to provide for the payment of all liens prior to the mortgage, and of all charges, expenses, and liabilities; and that they should assign their bid, or take title and convey the same to the purchasers, or make other disposition thereof as requested by the purchasers.

In pursuance of this arrangement, and by consent of Ames and Williams, trustees of the second mortgage, the final decree for foreclosure and sale was made on the 5th day of March, 1880. By the fifth clause of this decree it is declared and decreed that, besides the first mortgage bonds, 4,000 in number, and the coupons for interest thereon, there was due (in the words of the decree), "for replacement and repairs, additions and ameliorations made under the authority of this court, the sum of seven hundred thousand dollars, as shown by certificates, and which sum is a charge and incumbrance upon the said mortgaged property, according to the terms of the securities issued under the order of this court, besides the costs and expenses of the suit and of the management of the property, whereby it appears to the court that a sale of the property should be made, and the motion for the sale is therefore allowed."

By the sixth clause the trustees were directed, under the supervision of the master, to advertise and sell the mortgaged property for cash.

The seventh clause was evidently inserted in view of the preliminary agreements which had been made, and amongst other things decreed as follows:

"Seventh. The court further orders and decrees that it shall be competent for the holders of a majority or greater number of the bonds described in the deed of trust of the plaintiffs to form an agreement appointing a purchasing committee, or, if such an agreement has already been made by a majority of the bondholders, the committee so appointed therein may act, if the agreement empowers. . . . A copy of this agreement shall be deposited with the master, and be open to inspection ten days be-

fore the day of sale. . . . No more money shall be required than shall be sufficient, in the opinion of the master and trustees, to assure the payment of the ·charges and privileges upon the fund as shown by this decree, and the amount to be ascertained by the master's report before mentioned ; and also the charges, including those arising under the orders of the court before mentioned, defined in the first article of the deed of trust, and consisting of expenses of management, conduct of business, repairs, replacement, ameliorations, incidental charges of administration, and for compensation of service, for which there is not adequate provision for payment from the moneys on hand, and these charges the master must ascertain and give notice of at the sale."

By the eighth clause of the decree the master and trustees were directed to report the sale when made, with a draft of the conveyance to be made to the purchaser, or any assignee or substitute for the purchaser; and it was declared competent for the purchasing committee to assign their purchase. By the eleventh clause it was decreed that the trustees and receivers might move for their discharge at the time of the confirmation of the sale, and in the meantime might settle all their accounts in either capacity which had not been adjusted. It was further decreed that any surplus produced by the sale should be paid to the trustees of the second mortgage; and that these trustees should advertise and sell any property covered by the second mortgage which was not covered by the first mortgage. Under this decree the sale was advertised to take place on the 24th day of April, 1880.

A supplemental decree was made on the 9th of March, 1880, directing the master to proceed between that date and the day of sale to examine the accounts of the trustees, and ascertain what sums were due under the article of the deed of trust referred to in the decree, which provides for the payment of the expenses of management, charges for the custody of the property, compensation for service and allowance to trustees, &c.

The master made a preliminary report on the accounts on the 23d of March, 1880, but not on the subject of allowance to the trustees, or other preferred charges.

On the 27th of March, 1880, the purchasing agreement of February 10th was filed with the master; and the agreement of December 16th, 1879, was also laid before him.

On the 29th of March, the counsel for the trustees and receivers filed with the master a statement of the charges to be paid by the purchasers at the sale to be made on the 24th of April, in substance, as follows:

| | |
|---|---:|
| Certificates issued to raise money for repairs, &c. | $700,000 |
| To John E. Parsons, for services as counsel. | 15,000 |
| Allowance to E. D. Morgan and Jas. A. Raynor for services and compensation in the management of the railroad and conduct of the business other than the services of management and superintendence of the manager, being the particular services incident to trustees and receivers, annually from the date of entry on the property, $25,000, to be apportioned between them as they shall agree. | |
| Allowances (to which the plaintiffs assent) to the master of the court | 5,000 |

The costs and expenses of the suit in court.

A charge by the solicitor to be separately preferred.

On the 2d of April, 1880, William S. Williams and David Thomson filed objections and exceptions to this statement— stating that they did so as parties to the purchasing agreement of February 10th, 1880, and as bondholders; and as grounds of exception, state that there was no proof to sustain the charges, and that they were exorbitant and illegal.

On the 3d of April the counsel for the trustees and receivers moved to overrule the exceptions, as being in favor of no person having any interest.

The master proceeded to take proofs on the subject of the charges, and a great deal of testimony, and documentary evidence were adduced, going to show the great amount of trouble and litigation which the trustees and receivers and their counsel, had to encounter in the five years and more during which they had control of the property. This examination lasted up to the day preceding the sale.

On the 6th of April Williams and Thomson withdrew their opposition to the item of $700,000 for receivers' certificates.

On the 8th of April Foster and Thomson, named in the agreement of February 10th, 1880, as attorneys to represent the purchasers (Thomson and Williams) in settling the form of the decree, and in examining the title, &c., and who were to consult with the counsel for the trustees in carrying out the entire arrangement, filed an objection to the charges and allowances submitted by the trustees, except as to the receivers' certificates; and joined in the objections and exceptions of Williams and Thomson, and asked to be heard.

Thereupon the counsel for the trustees moved to dismiss the exceptions both of Williams and Thomson and Foster and Thomson, on the following grounds:

"Williams and Thomson appear as interposed persons or as brokers of the Louisville & Nashville Railroad Company to accomplish the purchase of the railroad in charge of the plaintiffs or trustees. Their contracts are with a voluntary committee of bondholders who have made a purchasing agreement. They have not purchased the railroad nor purchased the bonds, but have made an agreement with the committee that they should purchase and sell to the railroad on a variety of conditions which may not be fulfilled. Any higher bidder may acquire the railroad. The trustees have reserved right and obligation to purchase the road. Williams and Thomson may not appear and carry out one word of the engagement or comply with the conditions to bind the buyer with the bondholders' committee. They have no right to contest the claims or the accounts of the plaintiffs or those of the attorneys. They must take the property as they find it and the charges on it shall they purchase the property.

"2. The Louisville & Nashville Railroad Company furnish $5,000,000 in bonds to be used for the purchase; a portion is to be used to buy the bonds of the old company; a part to pay preferential charges and claims, and to return the property, amounting to $300,000. These two persons are to have the remnant not consumed by those charges on that fund. So, to make their commissions or brokerage or compensation larger, they come to

contest with trustees, attorneys, and officers of court, who for five years have been at work. The title to do this is insufficient.

" 3. Foster and Thomson are attorneys apparently for Williams and Thomson, to examine the title and arrange for the fulfillment of terms, but have no claim that Williams and Thomson have not."

It appears from the master's report, afterward filed, that on the 20th day of April, 1880, the solicitor for the complainants and the committee of bondholders withdrew "the previous claims (submitted March 29th, 1880), for any of the parties under the authority they conferred, all parties preferring to submit their claims anew," &c. The withdrawal was allowed as prayed for; whereupon the said claims were presented anew as follows, viz. :

| | |
|---|---:|
| "Amount of certificates of indebtedness | $700,000 00 |
| Do.  due to John E. Parsons, professional services. | 15,000 00 |
| Do.  do.  J. A. Campbell, professional services to be settled | 20,000 00 |
| E. D. Morgan claims for $15,000 annually from date of finding bill to April 1, 1880, for services, trustee and receiver, amounting to | 75,780 80 |
| J. A. Raynor likewise claims | 75,780 80 |
| Allowance recommended for master's services | 5,000 00 |
| Do.  do.  do  for journey to New York under decree, actual expense | 117 25 |
| Costs of the marshal in the cause | |
| Do do. clerk do | |
| Attorney's Docket fee | 20 00" |

On the 23d of April, Williams and Thomson and Williams separately, filed applications to the court for leave to be heard before the master and the court in opposition to the claim for charges and allowances; Williams stating that he held first mortgage bonds to the amount of $582,000, and represented others; and that he was a trustee under the second mortgage, and, as such, entitled to any surplus of the proceeds of sale, and interested in resisting and reducing the charges and allowances. Thomson and Williams stated that they had acquired rights under the purchasing agreement and were also first and

second mortgage bondholders, and had an interest as such to oppose the charges.

The court granted both of these applications, and the parties were fully heard before the master on the 23d of April.

The sale took place under the decree on the 24th of April, as advertised, and the property was bid off and adjudicated to the purchasing committee of the bondholders, Bliss, Von Hoffman, and Ames, under the direction of Williams and Thomson, according to the programme of the agreement, and the purchasing committee, at their request, assigned the bid to a new company organized for the purpose, called the New Orleans, Mobile and Texas Railway Company, as reorganized; and to this company the trustees executed a deed accordingly.

On the 3d of May the master made his report on the subject of charges and allowances, stating fully the proceedings before him. Amongst other things he says: "At the final hearing the only question discussed by the parties was as to the amount of the allowances to be made to the complainants for services incident to trustees and receivers; the exceptions to all of the other items of the claim for allowances seem to have been abandoned." And his conclusion is as follows: "That the exceptions of the opponents as to the amounts claimed by Messrs. Morgan & Raynor for their services as trustees and receivers at the rate of $15,000 per annum as being excessive, should be maintained, and that an allowance be made to the said Morgan & Raynor, trustees and receivers, for their services under the deed of trust herein, at the rate of $5,000.00 per annum, from March 12th, 1875, to May 8th, 1880, amounting to $25,677.24 (the said amount to be settled by and between them), as a sufficient compensation for their services. The preferential charges, allowances, and costs to be paid in the cause are as follows:

" Am't for certificates of indebtebtedness..........$700,000 00
    " due to John E. Parsons, counsel............  ˙15,000 00
    " J. A. Campbell ˙         do.............  20,000 00
    " E. D. Morgan and J. A. Raynor, trustees....  25,677 24
    " for publishing notice of sale in New York,
              New Orleans, and Mobile.............  1,485 70

| | | |
|---|---|---|
| Am't for marshal of the court..................... | $26 | 00 |
| " clerk " " ................... | | |
| " master's expenses to New York to deposit bonds................................ | 117 | 25 |
| " master's fee for services (left to the discretion of the court)........................ | | |
| " cost of mortgage certificates............... | | " |

This report was excepted to by the solicitor for the trustees and receivers, and the exceptions being argued, an order was made on the 7th of May 1880, recommiting the report, with instructions to allow Edwin D. Morgan a salary of $10,000 per annum, and James A. Raynor $15,000 per annum ; and to the solicitor of the trustees $6,000 per annum; all without reference to other allowances. The remainder of the report was confirmed.

In accordance with these instructions, the master reported on the disputed allowances as follows :

" Am't of allowance to J. A. Raynor, trustee, from
date of entry upon the property, Feb'y
1st, 1875, to May 8th, 1880, 5yrs. 3 mos.
and 8 days, @ $15,000.00 per annum.... $79,083 28
" allowance to E. D. Morgan, trustee, same time
as J. A. Raynor, @ $10,000 per annum.. 52,722 15
" allowance to J. A. Campbell, counsel fees, from
Feb'y 1st, 1875, to May 8th, 1880, 5 yrs.
3 mos. and 8 days, @ $6,000.00 per annum...31,633 28"

This report was excepted to on 8th of May by Williams and Thomson, as purchasers named in the contract of February 10th, 1880, and by Williams personally, as holder of 582 first mortgage bonds, and as representing others holding similar bonds, and also as trustee under the second mortgage. On the 17th of May the exceptions were dismissed. From this order the present appeal was taken, on the 21st of May, by Williams and Thomson, and by Williams personally, in the characters named above. After the appeal had been taken and allowed, the trustees filed their general accounts, which were duly

reported on and confirmed, including therein the full charges allowed by the master in his last report; and the trustees were discharged from their trust.

It may be remarked at once, that the proceedings in the court below, after the appeal was taken, if it was perfected in time, would not affect it if Williams and Thomson had a right to appeal, and if the order was an appealable one. These conditions existing, that branch of the case was no longer in possession of the court. There is no question that the appeal was perfected in time; the bond was approved and filed on the 31st of May, 1880.

As to the right of Williams and Thomson to appeal, this depends on their right to intervene and contest the allowances to the trustees; or rather on the power of the court to allow them to do so. And we do not well see how this power can be doubted if they had a substantial interest at stake. From the first, they claimed to have such an interest not only as interested under the purchasing agreement (a copy of which they filed with the master), but as bondholders chargeable with the payment of their part of the charges. Though a motion was made to overrule their exceptions, the master declined to pass upon it himself, and the proceedings before him were continued and progressed in (apparently by mutual consent) until the court could hear the motion. This it did on the 23d of April, when Williams separately, and Williams and Thomson jointly, presented (as we have seen) formal applications to be allowed to be heard before the master and the court. Williams claimed the right to be heard on the ground of his being a holder of first mortgage bonds to the amount of $582,000, and of representing others; and on the further ground of being one of the trustees of the second mortgage, entitled to any surplus; and Williams and Thomson claimed the same right, as being interested under the purchasing agreement, and also as being first and second mortgage bondholders. The court very properly, as it seems to us, granted their application. Their status as bondholders and otherwise does not seem to have been denied. As bondholders, and as interested under the second mortgage, if not under the purchasing agreement, we

do not well see how the court, under the circumstances, could have refused their application. The trustees themselves, who were the nominal complainants, were the parties interested to obtain large allowances for themselves, and could not be relied on to have them reduced.

From the time of the sale, on the 24th of April, 1880, if not before, Williams and Thomson became interested in the amount of the charges and allowances that were to be paid out of the extra $1,000,000 of Louisville and Nashville Railroad Company bonds. They were then committed to the carrying out of the purchasing agreement. The bid of the purchasing committee of the bondholders was made on their account and under their direction; it was made for them under the agreement, and they were virtually the purchasers; and from that time, the agreement of February 10th, 1880, governed the proceedings and rights of the parties. The bid was only $4,000,000, and yet the Louisville and Nashville Company issued its $5,000,000 of bonds pursuant to the agreement, $4,000,000 of which were to go to the first mortgage bondholders, and the other $1,000,000 were retained by the purchasers under their agreement to advance sufficient cash to meet the preferred claims. This they did, and all the claims were paid, the present controversy relating to the proper allowances to the trustees and receivers only remaining open. After the sale, it was the purchasers, and not the bondholders, who were interested in those allowances. It was a matter of no moment to the bondholders what allowances were made, for they were to have bond for bond in any event; it was a matter of great moment to the purchasers, for every dollar allowed to the trustees was so much less for them.

This case differs from that of *Swann* v. *Wright's Executors*, 110 U. S. 590, recently decided by this court. In that case Swann had purchased the railroad under a decree which provided that the sale should be subject to the liens already established, or which might be established on references then pending, as prior and superior to the lien of the mortgage; and the claim of Wright was one of this class, having been before the master, on reference, for nearly a year when the decree was made, and warmly contested by the bondholders. The

master did not report on the claim, it is true, until after the sale was made, and the purchaser applied to oppose its confirmation, and was not allowed to do so, and the sale was afterwards confirmed expressly subject to all liens established as specified in the decree of sale. Swann afterwards filed a bill to set aside Wright's claim for fraud in its inception. This bill was dismissed, and the decree of dismissal was affirmed by this court, on the ground that the property was purchased expressly subject to all established claims, or claims that might be established on references then pending, which included Wright's claim as much as if it had been named.

From this recital of the facts in that case it appears that the bondholders were permitted, as Williams and Thomson (also bondholders) were in the present case, to contest the claim sought to be established as prior to the mortgage. The purchaser was not allowed to contest the claim, because he had no right to do so by virtue of any stipulation made either at or before the sale : whereas in the present case, by the preliminary agreement made between the bondholders and the proposed purchasers (and who afterward became such), it was expressly stipulated that the latter were to have all that should be left of the purchasing fund agreed on, after paying $4,000,000 for the bondholders, and all preferred charges and allowances ;—a stipulation which made them directly interested in the amount of such charges and allowances, and made them so by the privity of the bondholders themselves. This, as it seems to us, placed the purchasers in the present case in a very different position from that which Swann occupied in the case cited. But, if we are mistaken in this view as regards their position as purchasers, there can be no doubt that as bondholders they had a right under the leave of the court (which was given to them, and which could not have been properly refused) to oppose the charges and allowances in question, and to appeal from the order by which they were allowed.

We think that the position of Williams and Thomson made them *quasi* parties in the case, and brought them within the reason of the former cases decided by this court in which persons incidentally interested in some branch of a cause have

been allowed to intervene for the purpose of protecting their interest, and even to come into this court, or to be brought here on appeal, when a final decision of their right or claim has been made by the court below. We refer to the cases of *Blossom* v. *Milwaukee Railroad*, 1 Wall. 655, where a purchaser at a foreclosure sale was admitted to appeal; *Minnesota Company* v. *St. Paul Company*, 2 Wall. 609, 634, to the same effect; *Hinckley* v. *Gilman, Clinton & Springfield Railroad*, 94 U. S. 467, where a receiver was allowed to appeal from a decree against him to pay a sum of money in the cause in which he was appointed receiver; *Sage* v. *Railroad Company*, 96 U. S. 712, where parties interested were allowed to appeal from an order confirming a sale; *Trustees* v. *Greenough*, 105 U. S. 527, where an appeal from an order for allowance of costs and expenses to a complainant sueing on behalf of a trust fund, was sustained; and *Hovey* v. *McDonald*, 109 U. S. 150, where an appeal was allowed to be brought against a receiver from an order made in his favor.

That the order was such as could be appealed from we think is equally apparent. It was final in its nature, and was made in a matter distinct from the general subject of litigation,—a matter by itself, which affected only the parties to the particular controversy, and those whom they represented.

We are then brought to the merits of this controversy. It concerns only the allowances to the trustees; nothing else was insisted on before us. The allowance made by the court below is certainly, to say the least, a liberal one. A great deal of evidence was adduced to show that a vast amount of labor and litigation and operations of perplexity and difficulty were performed by the trustees whilst they were acting as receivers of the court. We are perfectly satisfied that their application for allowance was a very meritorious one. They really lifted the road out of the mire, and renovated it from beginning to end, made important contracts, built expensive bridges, purchased a large amount of iron, and kept the concern on its legs until it could walk alone,—the financiering part not being the least important or difficult. But considering that one of the trustees had a very liberal salary, as manager and superintendent, and

his expenses paid, we think that the allowance made by the Circuit Court was larger than it should have been. It is unnecessary to review the evidence; it is too voluminous. The question is one of fact and estimation, and we will content ourselves by stating the conclusions at which we have arrived.

We are of opinion—

1. That Williams and Thomson had such an interest, and were so situated in the cause, that they had a right, by leave of the court, to except and object to the charges and allowances presented by the trustees and receivers, and that they had a right to appeal from the decree of the Circuit Court to this court.

2. That the said decree was a final decree for the purposes of an appeal.

3. That the allowance to said trustees was greater than, under the circumstances, it should have been. In our opinion the gross sum of $75,000 would have been a just and sufficient allowance to said trustees jointly for their services and compensation as trustees and receivers, exclusive of the salary paid to James A. Raynor as manager and superintendent.

4. That the residue of the order and decree of the Circuit Court should be affirmed, and that each party should pay their own costs on this appeal, except the costs of printing the record, which should be equally divided between the parties.

*It is therefore the judgment of this court, and so ordered, that the decree below be reversed as to the allowance made to Edwin D. Morgan and James A. Raynor as trustees and receivers as described in the record, and that the cause be remanded, with instructions to enter a decree allowing the said trustees and receivers jointly for their services and compensation as such trustees and receivers (independently of the salary allowed and paid to the said James A. Raynor, as manager and superintendent), the gross sum of $75,000 instead of the allowance made by the decree appealed from.*

*It is further ordered that the remainder of the said decree be affirmed, and that each party pay their own costs on this appeal, except the cost of printing the record, which is to be equally divided between the parties.*