**Eldon T. CORDOZA, Plaintiff–Appellee,**

**Bruce Train; Hans Lemcke; Theodore Sorensen; Passco Administrative Services, Inc.; Passco Development, LLC, Appellants,**

**v.**

**PACIFIC STATES STEEL CORPORATION, Defendant,**

**and**

**Rust Remedial Services Holding Company, Inc.; Community Redevelopment Agency for the City of Union City, Real Parties in Interest–Appellees.**

**Eldon T. Cordoza; John Franco; Theodore Kutsuki; Santos Mora; Eugene Luna; Ray Seccombe, on behalf of themselves and all others similarly situated, Plaintiff–Appellee,**

**v.**

**Bruce Train, Defendant–Appellant,**

---

Rust Remedial Services Holding Company, Inc.; Community Redevelopment Agency for the City of Union City, Real Parties in Interest–Appellees.

Nos. 01–16638, 02–15110.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 2002.

Filed Feb. 20, 2003.

Robert A. Goodin, San Francisco, CA, for defendants-appellants, Bruce Train, Hans Lemcke, Theodore Sorensen, Passco Administrative Services, Inc., and Passco Development Co., LLC.

Arthur Lazear, Oakland, CA, for plaintiffs-appellees, Eldon T. Cordoza, et al.

Charles Reese, Oakland, CA, for real party in interest-appellee, Community Redevelopment Agency–Union City.

Larry W. Telford, San Franciso, CA, and Walter J. Sears, III and Scott Smith, Birmingham, AL, for real party in interest-appellee Rust International Inc.

Tamar Pachter, San Francisco, CA, for amicus curiae U.S. District Court for the Northern District of California.

Before: McKEOWN and PAEZ, Circuit Judges, and POLLAK, District Judge.*

McKEOWN, Circuit Judge:

This appeal comes to us from the midst of lengthy post-judgment proceedings in an Employee Retirement Income Security Act case. For nearly two decades, the district court has overseen efforts by a series of special masters to transform an insolvent company's contaminated steel plant site into a means of funding the former steelworkers' medical plan. After other parties accused the special master of serious misconduct, the district court launched an investigation, held a hearing, and finally relieved the special master of his duties, requiring him to disgorge a portion of the considerable sum he had already retained as compensation.

The terminated special master now appeals these orders, although development of the steel plant site continues under a new special master. As a threshold matter, we address whether we have jurisdiction over this interlocutory appeal. We consider whether a special master has the right to appeal orders affecting his termination and compensation and whether the orders are final or meet the requirements

---

* The Honorable Louis H. Pollak, Senior United States District Court Judge for the Eastern District of Pennsylvania, sitting by designation.

of the collateral order exception recognized in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546–47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Although the special master may appeal orders affecting him, the orders here are neither final nor do they fall within the *Cohen* exception. We do, however, treat the appeal as a petition for a writ of mandamus. Having reviewed the considerable record and the district court's lengthy and careful findings, we conclude that a writ is not appropriate because the district court did not make a clear error or exceed its authority under Federal Rule of Civil Procedure 53 in supervising the special master and setting his compensation.

### BACKGROUND AND PROCEDURAL HISTORY

The Pacific States Steel Corporation ("PSSC") operated a plant in Union City, California, that shut down in 1978, leaving a parcel of contaminated land and a bankrupt medical plan for retired steelworkers and their dependents. These pensioners filed a class action in the United States District Court for the Northern District of California with now-Chief Judge Marilyn Hall Patel presiding over the case. Judge Patel ordered PSSC to continue paying the pensioners' medical benefits, but the company had few assets from which to obtain the necessary funding. Judge Patel and the parties decided that the best way to fund the medical plan was to clean up and develop the toxic land on which the plant had been located.

Little did Judge Patel know that these post-judgment proceedings would become a miniature *Jarndyce v. Jarndyce*, grinding on for more than two decades after the steel plant had closed its doors.[1] The first special master, appointed in 1984 to deter-

mine the assets and liabilities of PSSC, tried unsuccessfully to develop the plant site. He was then replaced in 1990 by the appellants, Bruce Train and his associates, Theodore Sorensen and Hans Lemcke (collectively referred to as "Train" or "the Special Master").

In 1995, Train proposed, and Judge Patel adopted, an Amended Plan under which Train would form two companies, PASSCO Administrative Services and PASSCO Development Company, to obtain funding, develop the plant site, and use the resulting profits to pay the medical benefits. Services were to be billed on an hourly basis. In a somewhat unusual arrangement, Train was to receive other kinds of compensation, including an interest in the developed land. But the Amended Plan's terms, including Train's compensation, were always subject to further modification by the district court.

Train reached agreements in 1994 and 1995 with the Redevelopment Agency for the City of Union City ("RDA") for funding that resulted in the development of a small part of the plant site, where homes have now been built. Train also persuaded Rust Remedial Services, Inc. ("Rust") to perform clean-up work on the site for deferred compensation.

By 1996, negotiations between Train and all of the other parties involved in developing the rest of the plant site had bogged down amid mutual antagonism. A major sticking point seemed to be the amount of Train's compensation. Three years later, after the parties failed to reach a compromise in settlement conferences before a magistrate, Judge Patel conducted a settlement conference herself. Upon observing the parties during the conference, she

---

1. *See generally* Charles Dickens, *Bleak House* (1853); *see also* David I. Levine, *Calculating Fees of Special Masters*, 37 Hastings L.J. 141, 147 n.23 (1985) (discussing the accuracy of Dickens' account of the dismal state of English Chancery proceedings, including the role played by special masters).

began to have "grave concerns" about Train's motivations and "whether he could in fact accomplish the task assigned him—development of the property for the benefit of the pensioners."

Judge Patel then started an investigation, consulting with outside real estate experts, ordering Train to produce his books and records, directing him not to spend any more of PSSC's money, and appointing an independent auditor. She also suspended Train pending the outcome of the investigation and appointed court overseers to manage PSSC. After learning that Train was still speaking to potential developers, the district court again issued an order reminding Train that he had been suspended.

In August 2000, after the auditor's report was released, RDA filed a motion requesting that the district court set the Special Master's final compensation at $3 million and order disgorgement of all compensation received in excess of that amount. Although determined to avoid having "satellite litigation spawned" over the compensation issue, Judge Patel permitted limited discovery. Train filed a motion requesting that Judge Patel recuse herself. The court held a hearing on the recusal motion and the compensation motion in mid-September 2000. Train was finally terminated as Special Master on December 1, 2000. At the same time, Judge Patel denied the recusal motion and established discovery procedures.

After four days of hearings, in early 2001, the district court entered a lengthy order, complete with detailed findings, examples, and record references. While acknowledging that Train had resolved some of the infrastructure problems and had initially obtained some funding from the RDA for the site, Judge Patel found that, in the end, Train had not accomplished the primary tasks for which he was appoint-

ed—the development of the plant site and the funding of the medical plan.

In the meantime, Judge Patel concluded, Train had (1) rejected valid offers from the RDA in order to hold out for more compensation for himself, (2) misappropriated creditors' funds by forming a $1 million litigation war chest, (3) paid for personal tax advice with PSSC funds, and (4) overbilled for a legal assistant. Judge Patel also noted that Train had failed to keep records or attempt to track down the medical fund recipients, preventing the pensioners from being identified even when there were funds to pay them.

In the final order setting the Special Master's compensation, Judge Patel accepted that the Special Master's work could be valued at $3.6 million ($1.2 million already received by each of the individual appellants Train, Lemcke, and Sorensen), but ordered Train personally to disgorge $48,035 for personal legal services he charged to PSSC and $65,034 for overbilling the services of the legal assistant. Judge Patel later awarded $24,634 in attorney's fees. Train appeals the termination, compensation, and attorney's fees orders and the denial of the motion to recuse.

## DISCUSSION

■ The threshold issue is whether we have jurisdiction to hear this appeal. We conclude that we lack jurisdiction because the orders Train now appeals are not final judgments under 28 U.S.C. § 1291, nor do they fit within the narrow exception for review of collateral orders. *See Cohen,* 337 U.S. at 546–47, 69 S.Ct. 1221. Although we may consider the notice of appeal as a petition for a writ of mandamus, we decline to issue the writ because the district court's orders were not "a clear abuse of discretion." *See Bankers Life & Cas. Co. v. Holland,* 346 U.S. 379, 383, 74 S.Ct. 145, 98 L.Ed. 106 (1953).

## I. A SPECIAL MASTER'S RIGHT TO APPEAL

This is the rare situation in which an officer of the court is appealing from an order of the court. Federal Rule of Civil Procedure 53 gives the district court authority to appoint a special master, to "specify or limit" his powers, and to fix his compensation. Fed.R.Civ.P. 53(a),(c). Rule 53 is derived from Equity Rules regulating "masters in chancery," officers "appointed by the court to assist it in various proceedings incidental to the progress of a cause before it." *Kimberly v. Arms*, 129 U.S. 512, 523, 9 S.Ct. 355, 32 L.Ed. 764 (1889); *see* David I. Levine, *The Authority for the Appointment of Remedial Special Masters in Federal Institutional Reform Litigation*, 17 U.C. Davis L.Rev. 753, 784–88 (1984) (discussing examples from before and after the promulgation of the Equity Rules).

The moniker of "special" master underscores the unique nature of the master's role. A special master is a "surrogate" of the court "and in that sense the service performed is an important public duty of high order in much the same way as is serving in the Judiciary." *Louisiana v. Mississippi*, 466 U.S. 921, 921, 104 S.Ct. 1701, 80 L.Ed.2d 175 (1984) (Burger, C.J., dissenting in part from the allowance of the Special Master's expenses); *See In re Gilbert*, 276 U.S. 6, 9, 48 S.Ct. 210, 72 L.Ed. 441 (1928) (observing that accepting appointment as a special master means assuming "the duties and obligations of a judicial officer"); *York Int'l Bldg., Inc. v. Chaney*, 527 F.2d 1061, 1068 (9th Cir.1975) (noting the "well established principle" that special masters administering bankruptcy estates "are not acting as private persons, but as officers of the court."). Indeed, in this era of complex litigation, special masters may, subject to judicial review, be called upon to perform a broad range of judicial functions—supervising discovery, issuing stipulations of fact, and in exceptional circumstances, hearing and making recommendations with regard to motions to dismiss and for summary judgment. *See Burlington N. R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1073 (9th Cir. 1991) (discussing *In re Armco, Inc.*, 770 F.2d 103, 105 (8th Cir.1985)); 9 James Wm. Moore et al., *Moore's Federal Practice* § 53.40–49 (3d ed.2002) (listing specific types of cases).

Judge Patel's appointment of special masters to develop the plant site and fund the medical plan continues a long tradition, with its roots in equity, of using special masters in post-judgment proceedings. Linda J. Silberman, *Masters and Magistrates Part II: The American Analogue*, 50 N.Y.U. L.Rev. 1297, 1321–1323 (1975); *Hilao v. Estate of Marcos*, 103 F.3d 767, 782 (9th Cir.1996) (special master appointed to supervise taking of depositions of randomly-selected class members to determine distribution of compensatory damages award); *New York State Ass'n for Retarded Children v. Carey*, 706 F.2d 956, 962–65 (2d Cir.1983) (approving the appointment of a special master to monitor compliance with a consent decree). In light of this tradition, it might seem strange to suggest that a special master can suddenly shift roles from surrogate of the court to quasi-party with the right to challenge that court's order setting his compensation. *See Devlin v. Scardelletti*, 536 U.S. 1, 122 S.Ct. 2005, 2009, 153 L.Ed.2d 27 (2002) ("'[O]nly parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment.'") (quoting *Marino v. Ortiz*, 484 U.S. 301, 304, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988)) (per curiam).

Nonetheless, the right of a special master to appeal is also part of that tradition.[2]

---

**2.** Contrary to assumptions of the parties and the district court, whether Train can appeal

In *Hinckley v. Gilman, Clinton, and Springfield Ry. Co.*, the Supreme Court permitted a receiver to appeal an order "relating to the settlement of his accounts," reasoning that "[f]or this purpose he occupies the position of a party to the suit, although an officer of the court." 94 U.S. 467, 469, 24 L.Ed. 166 (1876). The order setting his compensation made the receiver "subject[ ] to the jurisdiction of the court," and so he had the "corresponding right to contend against all claims made against him." *Id.* A review of cases confirms that appeals by special masters are indeed rare and few in number. *See, e.g., Ehrhorn v. Quillinan*, 170 F.2d 890 (2d Cir.1948); *Pleasants v. Southern Ry. Co.*, 93 F. 93 (4th Cir.1899). Lest we be tempted by the parties' suggestion that *Hinckley's* advanced age renders it obsolete, the Supreme Court reaffirmed *Hinckley's* continuing vitality just last year when holding that a non-class member who did not successfully intervene in the district court could still appeal a class settlement. *See Devlin*, 122 S.Ct. at 2009. As the Supreme Court recognized, the receiver in *Hinckley* could appeal because he was a party in the limited sense that he was bound by the order setting his compensation. *Id.* at 2009–10; *see also Williams v. Morgan*, 111 U.S. 684, 698–99, 4 S.Ct. 638, 28 L.Ed. 559 (1884) (referring to litigants such as the receiver in *Hinckley* as "quasi-parties"). Train is similarly bound, and because *Hinckley* remains good law, Train has the right to appeal.

## II. FINAL AND COLLATERAL ORDERS

Although Train has the right to appeal, he can only do so from orders constituting a final judgment under 28 U.S.C. § 1291[3] or fitting within the narrow collateral order exception established in *Cohen*. *See* 337 U.S. at 546–47, 69 S.Ct. 1221. The fact that Train is bound by the orders he now appeals does not make those orders final or collateral.

Here, Train's situation diverges from the facts in *Hinckley*, where the Court assumed the finality of the compensation order because the underlying case had wrapped up: "This will not keep any thing in litigation but the receiver's accounts. The title to the property and the possession under the sale cannot be in any manner affected." *Hinckley*, 94 U.S. at 469.[4] In contrast, the orders Train appeals are not final judgments under 28 U.S.C. § 1291 because they do not resolve all of the issues in the post-judgment proceedings. *See SEC v. American Principals Holdings, Inc.*, 817 F.2d 1349, 1350–51 (9th Cir.1987) (holding that an order setting a receiver's compensation is not a final judgment). Although the matter of Train's compensation has been resolved, development of the property under a different special master and the allocation of funds among the various parties will continue. *See id.*

██ Nor do we conclude that the orders from which Train appeals fall "in that small class" that are "too important to be denied review and too independent of the

the orders is not a question of standing. Train has a financial interest in his compensation that easily satisfies Article III's requirements of injury, causation, and redressability. *See Devlin*, 122 S.Ct. at 2009.

3. 28 U.S.C. § 1291 states in part that "[t]he courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States ...."

4. Justice Scalia's dissent in *Devlin* refers to the order setting the Special Master's pay in *Hinckley* as "collateral," and thus potentially fitting within the *Cohen* exception. *Devlin*, 122 S.Ct. at 2014 (J. Scalia, dissenting). The majority did not accept this characterization. *See id.* at 2009–10.

cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen,* 337 U.S. at 546–47, 69 S.Ct. 1221. To qualify as collateral orders, they "must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1066 (9th Cir.2000) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)) (internal quotation marks omitted).

As Train is no longer the special master, these orders probably do meet the first requirement because they are "made with the expectation that [they] will be the final word on the subject addressed." *Id.* (internal quotation marks and citations omitted).

Even so, the orders fall short of meeting *Cohen's* other requirements. We are not convinced that the orders concerning Train are simply the outcome of a collateral case entirely separate from the post-judgment proceedings in which they were issued. Unlike, for example, an order imposing sanctions on an attorney, which is a distinct judgment against a non-party to the litigation, the order setting Train's compensation is intertwined with the corpus of the litigation in that it determines what share of an existing pool of money will go to him, and what share will go to RDA, Rust, and the pensioners. *Compare American Principals,* 817 F.2d at 1351, *with Optyl Eyewear Fashion Int'l Corp. v. Style Cos.,* 760 F.2d 1045, 1047 n. 1 (9th Cir.1985) (holding that the court has jurisdiction of an interlocutory appeal by a nonparty attorney from a sanctions order).

We also cannot say with any conviction that the issues addressed in the orders Train appeals rise to the level of importance required by *Cohen.* We acknowl-

edge that the compensation issue is important to Train, but his interest in settling the compensation is not "weightier than the societal interests advanced by the ordinary operation of final judgment principles." *Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 879, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994) (denying interlocutory review of orders refusing to enforce a settlement agreement). Train does not assert a right akin to the ones that typically justify immediate appeal. *See, e.g., Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (holding that a state's immunity under the Eleventh Amendment meets the "importance" requirement); *Abney v. United States,* 431 U.S. 651, 659–60, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (holding that a criminal defendant may appeal an adverse ruling on a double jeopardy claim without waiting for the conclusion of his trial). Although we held in *Riverhead Sav. Bank v. National Mortgage Equity Corp.,* 893 F.2d 1109, 1114 (9th Cir.1990), that a large amount of money involved— $15,000—may establish sufficient "importance," the order appealed in that case was a sanction against an attorney, not the compensation award of a court officer. *See id.* The rights that Train asserts here fall short of meeting *Cohen's* "strict" importance requirement. *See Digital Equip.,* 511 U.S. at 879, 883, 114 S.Ct. 1992; *see also Alaska v. United States,* 64 F.3d 1352, 1354 n. 3 (9th Cir.1995) (noting that rights under public law are more likely to meet the importance requirement than contract rights); *Hill v. MacMillan/McGraw Hill Sch. Co.,* 102 F.3d 422, 425 (9th Cir.1996) (limiting *Riverhead* to its facts).

Finally, the orders are not appealable under *Cohen's* third requirement because they can be reviewed at the end of the post-judgment proceedings. *See Ameri-*

*can Principals,* 817 F.2d at 1351 (holding that the "issue of the receiver's compensation can be appealed at the conclusion of the receivership.") We are aware that these proceedings are nearly twenty years old and may continue for some time. But according to Judge Patel's report, Train helped create this quagmire by failing to carry out his responsibilities. We also note that adherence to the procedural rules governing appeals does not leave Train wholly uncompensated in the interim, as Judge Patel's disgorgement orders still permit Train to keep more than $1 million.

In any event, the Supreme Court has cautioned against conducting a case-by-case analysis. *Digital Equip.,* 511 U.S. at 868, 114 S.Ct. 1992. We have already determined that orders setting receivers' compensation in post-judgment proceedings are not appealable, and we must consider "the entire category" to which Train's claim belongs, "without regard to the chance that the litigation at hand might be speeded, or a particular injustic[e] averted, by a prompt appellate court decision." *Id.* (internal quotation marks and citation omitted). Even were Train's claim especially compelling, that circumstance does not outweigh the high cost of permitting interlocutory appeals by special masters in every case, which could result in a cascade of auxiliary lawsuits emerging from already vermiculate litigation. Because the orders Train appeals are neither final nor collateral, we do not have jurisdiction to review them.

## III. WRIT OF MANDAMUS

■ Although Train has not filed a petition for a writ of mandamus, a notice of appeal from an otherwise nonappealable order can be considered as a mandamus petition, "an extraordinary remedy that may be obtained 'only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exer-

cise its authority when it is its duty to do so.'" *Executive Software N. Am., Inc. v. United States Dist. Court,* 24 F.3d 1545, 1550 (9th Cir.1994) (quoting *Will v. United States,* 389 U.S. 90, 95, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)); *see* 28 U.S.C. § 1651(a). In treating Train's notice of appeal as a mandamus petition, we review the district court's orders, not for an abuse of discretion, but for clear error. *Executive Software,* 24 F.3d at 1551. Under this standard, we will only issue the writ for usurpation of judicial power or a clear abuse of discretion. *Id.* Five "objective principles" guide the inquiry: whether (1) Train has no other adequate means, such as direct appeal, to attain the relief, (2) he will be damaged or prejudiced in a way not correctable on appeal, (3) the district court's order is clearly erroneous as a matter of law, (4) the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules, or (5) the district court's order raises new and important problems, or issues of law of first impression. *Id.*

■ We address the third factor first, because the others are irrelevant if the district court's conclusions were legally correct. *Executive Software,* 24 F.3d at 1551 (citing *Survival Sys. Div. of Whittaker Corp. v. United States Dist. Court,* 825 F.2d 1416, 1418 n. 1 (9th Cir.1987)). Here, nothing in the record supports issuing a writ of mandamus because Judge Patel did not abuse her discretion, much less make a clear error. We consider separately the order denying the motion to recuse and the orders setting Train's compensation and awarding attorney's fees.

### A. THE ORDER DENYING THE MOTION TO RECUSE

■ Train argues that Judge Patel should be recused from hearing matters related to his compensation because her

"impartiality might reasonably be questioned" and because she had a bias against Train resulting from "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(a),(b)(1).[5] We issue writs of mandamus requiring recusal of a district court judge under § 455(b)(1) only in cases where bias stems from "extrajudicial source[s]" and "not from a judge's conduct or rulings during the course of judicial proceedings." *King v. United States Dist. Court,* 16 F.3d 992, 993 (9th Cir.1994) (internal quotation marks and citations omitted). We decline to grant a writ of mandamus on the basis of either provision of § 455.

■■■ The district court's authority under Rule 53 to appoint the special master, to fix his pay, and to direct him "to do or perform particular acts," Fed.R.Civ.P. 53(a),(c), necessarily includes the power—as well as the responsibility—to supervise the special master and to investigate and determine whether the special master is in fact carrying out his duties. *See Newton v. Consolidated Gas Co.,* 259 U.S. 101, 106, 42 S.Ct. 438, 66 L.Ed. 844 (1922) (finding special master's pay excessive and reducing it); *In re Gilbert,* 275 U.S. 499, 499–500, 48 S.Ct. 113, 72 L.Ed. 393 (1927) (after the special master refused to disgorge excessive pay, requiring the special master to show cause why he should not be disbarred and punished for contempt); *Universal Oil Prods. Co. v. Hall,* 76 F.2d 258, 263 (8th Cir.1935) (holding with regard to special masters that it is the "duty of the court to make stern and searching inquiry into the facts and to inform itself fully what the conduct of its officer had been"). Given the district court's supervi-

sory role under Rule 53, we do not believe "a reason able person with knowledge of all the facts would conclude" that Judge Patel's "impartiality might reasonably be questioned" simply because she was evaluating Train's conduct. *Milgard Tempering, Inc. v. Selas Corp. of America,* 902 F.2d 703, 714 (9th Cir.1990) (internal quotation marks and citations omitted); 28 U.S.C. § 455(a). Her evaluation was part and parcel of the judge's supervisory role over the special master. To hold otherwise would undermine the district court's authority under Rule 53 and compromise the court's ability to utilize complementary judicial resources.

Train argues, however, that, once Judge Patel suspended him and began the investigation, his status changed—he was no longer a judicial officer, but the defendant in a separate case concerning his compensation. Within the scope of that collateral case, Train contends, Judge Patel made *ex parte* contacts, and the information from these "extrajudicial sources" caused the judge to form actual bias requiring recusal. *See* 28 U.S.C. § 455(b)(1); *King,* 16 F.3d at 993.

By way of example, Train points to an August 4, 2000 order precluding Train (who was already suspended) from taking actions regarding PSSC property. That order is supported by an affidavit from Rust's counsel stating that Train had been talking with potential developers in violation of Judge Patel's orders. This affidavit apparently was not made available to the parties before the order was issued. In later denying Train's motion to recuse, Judge Patel acknowledged that she "sought guidance from real estate experts"

---

**5.** 28 U.S.C. § 455 reads in part:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:
(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . .

before initially suspending Train, and that she was "informed by the Court Overseers" that Train had continued to talk to developers despite his suspension.

Train misapprehends the role of the district judge in overseeing a special master. At all times Train was working under the auspices of the court. The fact that he ran into rough waters with the court and the parties does not magically transform him from a judicial officer into an ordinary litigant. Train's situation can be contrasted with that in *Edgar v. K.L.*, 93 F.3d 256 (7th Cir.1996), which involved expert opinions on the merits of a pending case. There the Seventh Circuit held that recusal was required under both 28 U.S.C. § 455(a) and (b)(1) when the district court judge met independently with court-appointed experts who tried to persuade the judge to use their method of evaluating Illinois' health care system. *K.L.*, 93 F.3d at 259–60. In such circumstances, the information is received in a "personal" rather than "judicial" capacity. *See id.* at 259.

Here the contested questions went to the heart of Train's appointment by the court. Surely the court should be given broad latitude to determine how to conduct its judicial oversight. Judge Patel wore two hats—one administrative, the other deliberative, but both part of the judicial decision-making process. She gave the special master the opportunity for a fair hearing without sacrificing the parties' interest in promptly achieving the goals of the post-judgment proceedings. Although Train's interests are not to be trivialized, he does not stand in a strictly parallel position to a party litigant. With these considerations in mind, we believe that Judge Patel carefully balanced Train's interest in receiving due process with her responsibility for supervising the special master's efforts and, above all, seeing that the plant site is developed and the pension fund paid.

Unlike in a traditional contested proceeding, Judge Patel's administrative responsibilities gave her substantial latitude to consult with outside sources to help inform her decisions. *See Martin v. Luster*, 85 F.2d 833, 840 (1936) ("In the conduct of a receivership, courts are required to make administrative orders and seldom do the court files completely record all of the understandings and fact representations which are known to the court only."). The fact that Judge Patel received information in her administrative capacity does not, without more, require her recusal from evaluating Train's conduct in a deliberative capacity. *See Duckworth v. Department of Navy*, 974 F.2d 1140, 1142–43 (9th Cir.1992) (decision by the Chief Judge declining to recuse himself from a panel hearing the appeal, even though he had investigated a complaint against the district court judge by one of the parties in the case).

To the extent that Judge Patel received limited information *ex parte*, she did so in order to preserve the integrity of the judicial process. Having learned of serious complaints against an officer of the court, Judge Patel sought to preserve the record and obtain from independent sources the information she needed to protect the interests of the pensioners until a more thorough evaluation of Train's performance could be made. In making that evaluation, Judge Patel provided Train with ample due process. She set Train's compensation only after permitting him to conduct discovery, and only after holding a four-day hearing. She also appointed an outside auditor to file a report, which was made available to all parties. Any inference that she acted on *ex parte* information to prejudge Train, rather than to protect the interests of the fund and its beneficiaries and the integrity of the court, cannot be sustained. No evidence

of bias exists to justify Judge Patel's recusal.

## B. THE OTHER ORDERS REGARDING THE SPECIAL MASTER

█ We also hold that Judge Patel did not make a clear error worthy of mandamus in issuing the other orders regarding Train. In a comprehensive and detailed forty-page order, Judge Patel catalogued abundant evidence in support of both her earlier orders limiting, and eventually terminating, Train's authority as Special Master, as well as the final orders setting the amount of his ultimate compensation and awarding attorney's fees.

Judge Patel concluded that Train's early efforts from 1990–1995 warranted his keeping much of the money he already received. Against this favorable finding she weighed numerous improprieties—breaches of fiduciary duty, unethical behavior, failure to keep records, lying and disloyalty to the court, alienating the only source of funding, and a general failure to accomplish the task for which he was appointed. Facing the difficulty of quantifying the damage from Train's behavior, Judge Patel ordered Train to disgorge only the amount spent on legal services for himself and the amount improperly billed for the services of a legal assistant.

Train argues that the district court should have set his compensation according to a fee schedule attached to the 1995 Plan approved by the court. But the plan itself states that it can be amended and, at any rate, Judge Patel had broad discretion under Rule 53 to adjust Train's pay according to his performance. *See* Fed. R.Civ.P. 53(a); *Newton,* 259 U.S. at 104–05, 42 S.Ct. 438; *see also Pleasants,* 93 F. at 95 (holding that a special master's com-

pensation should be determined after the work is completed). Even if the 1995 Plan were a firm agreement setting Train's ultimate pay, it was not a contract. *See Pleasants,* 93 F. at 94–95. Indeed, Train acknowledged in earlier pleadings before the district court that Judge Patel could freely adjust his compensation and that he had no right to any specific compensation.

█ Train argues that Judge Patel's findings are not supported by the evidence. This attack at best raises a factual dispute, not the prospect that the district court made a clear error requiring a writ of mandamus. Although we do not endeavor to analyze each of the factual findings at this stage of the litigation, we note that the findings are detailed and backed by specific examples and citation to documentary evidence. If Judge Patel abused her discretion, the matter can be considered on direct appeal, and Train's compensation can be adjusted accordingly. Similarly, we see no clear error in the awarding of attorney's fees to the parties for the cost of exposing Train's alleged misconduct. That award, too, can be appealed at the conclusion of the current proceedings.

The notice of appeal is construed as a petition for a writ of mandamus, which is **DENIED.**